**2021 IL 125656**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125656)

MARY REHFIELD, Appellant, v. DIOCESE OF JOLIET, Appellee.

*Opinion filed February 4, 2021.*

CHIEF JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Garman, Theis, Neville, Michael J. Burke, and Overstreet concurred in the judgment and opinion.

Justice Carter took no part in the decision.

**OPINION**

¶ 1    Plaintiff Mary Rehfield filed a two-count amended complaint against defendant, the Diocese of Joliet, alleging retaliatory discharge and violation of the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2016)). Defendant filed a combined motion to dismiss the complaint with prejudice, which the trial court

granted. On appeal, the appellate court affirmed the dismissal based on the doctrine of ecclesiastical abstention. 2019 IL App (3d) 180354. We granted plaintiff's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Oct. 1, 2019)). For the reasons that follow, we affirm the appellate court's judgment.

¶ 2                                  BACKGROUND

¶ 3        On February 27, 2018, plaintiff filed a two-count first amended complaint in the circuit court of Will County against defendant. The first amended complaint alleges the following facts, which we take as true for purposes of our review. See *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006); *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 486 (2001).

¶ 4        Plaintiff served as an educator for more than 43 years, including nearly 18 years as a principal throughout Illinois. In 2012, plaintiff was hired as the principal of St. Raphael Catholic School (St. Raphael) in Naperville, Illinois. The school educates students from preschool through eighth grade with an average enrollment of 310 students and approximately 25 teachers and staff members. As of May 2017, plaintiff was "in strong standing" at St. Raphael. She had received a "glowing performance review" and was nominated for "Outstanding Principal of the Year" for the 2016-17 school year by St. Raphael's pastor, Father Daniel Bachner. Plaintiff had been offered a new contract to continue as principal for the 2017-18 school year, which she had accepted.

¶ 5        Prior to these events, in January 2016, the mother of a student alerted a teacher that her daughter had been "picked on" at school. The teacher addressed the issue and believed it to be resolved. On January 27, 2016, the teacher received an e-mail from the student's father, William MacKinnon, who lived in Massachusetts. MacKinnon stated, in substance, that he wanted the teacher to ensure his daughter was no longer bullied. The e-mail was "rude in tone, but not threatening." The teacher notified plaintiff, who consulted with Father Bachner. With his agreement, plaintiff responded to MacKinnon. She asked him to bring future concerns directly to her attention and communicate in a more collegial manner. MacKinnon responded and apologized for the tone of his previous e-mail.

¶ 6        Soon after his January 2016 e-mail, MacKinnon sent several additional e-mails to the same teacher. The teacher informed plaintiff of these additional e-mails. Plaintiff "perceived the emails as a potential threat." After consulting with Father Bachner, and with his approval, plaintiff contacted the police. The police advised her that no further action needed to be taken at that time.

¶ 7        Approximately one month later, in the spring of 2016, plaintiff received a "concerning" e-mail from MacKinnon. Plaintiff again notified the police. After consulting with the police and Father Bachner, and with their approval, plaintiff distributed a photograph of MacKinnon to the faculty members and staff of the school and the parish with instructions to call 911 if MacKinnon was seen on campus.

¶ 8        On February 7, 2017, Father Bachner received a several-minute-long voicemail from MacKinnon in which MacKinnon "rant[ed] about priests and the Church." To the extent that the message was threatening, the threat was to Father Bachner. When plaintiff learned of the voicemail, she promptly contacted the police and requested that they review the matter. The police issued an arrest warrant for MacKinnon.

¶ 9        Following the arrest warrant, plaintiff sought input and advice from the police, Father Bachner, and the school's superintendent, Father John Belmonte. Based on these communications, plaintiff again distributed a photograph of MacKinnon to school and parish staff and informed them to call 911 if they saw MacKinnon. The police and Father Bachner advised plaintiff "that it was unnecessary and even inappropriate to communicate about this matter with parents, under all the circumstances."

¶ 10       On May 8, 2017, the *Naperville Sun* published a story with the headline: "Man vowed to 'terrorize' Naperville school: authorities." The story inaccurately stated that MacKinnon's February 7 message was sent to plaintiff rather than to Father Bachner. The newspaper also inaccurately reported that MacKinnon threatened to terrorize the school and its staff. After the story was published, concerned parents contacted plaintiff and others at St. Raphael. On May 9, plaintiff sent a letter to parents explaining the situation. A meeting with parents was scheduled. Prior to the meeting, plaintiff participated in a discussion with Father Bachner, Father Belmonte, assistant principal Jen Timmons, diocese administrator Mike Bava, and diocese attorney Maureen Harton. They discussed the message that plaintiff should

relay to parents. Plaintiff agreed to follow the advice from her superiors and the Diocese's legal counsel. At the meeting with parents, some parents expressed anger that they were not informed of the situation earlier, and some called for plaintiff's termination. Plaintiff "remained calm and professional, addressing parents' questions."

¶ 11    Days after this meeting, the Diocese terminated plaintiff from her position as principal of St. Raphael. Plaintiff was terminated because she reported the threatening conduct of a parent to the police and because the Diocese made her a scapegoat for a situation it found embarrassing and problematic. Plaintiff suffered significant financial and emotional distress as a result of her termination and has been unable to find another job.

¶ 12    Count I of plaintiff's first amended complaint, titled "Retaliatory Discharge," alleges that defendant unlawfully retaliated against plaintiff by terminating her for reporting a parent's threatening conduct to police. Plaintiff alleges her termination is in direct conflict with the public policy in this State to investigate and prosecute criminal offenses. She further alleges that defendant's actions are likely to make other staff and faculty members reluctant to come forward to report potentially unlawful or criminal conduct. In count II, plaintiff alleges that defendant's actions violated the Whistleblower Act, which provides in part that an employer may not retaliate against an employee for disclosing information to a law enforcement agency where the employee has reasonable cause to believe the information discloses a violation of a state or federal law, rule, or regulation. See 740 ILCS 174/15(b) (West 2016). In her prayer for relief, plaintiff seeks compensatory and punitive damages as well as attorney fees, costs, and expenses.

¶ 13    Defendant filed a combined motion to dismiss the first amended complaint with prejudice, pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2016)). See *id.* § 2-619.1. In this motion, defendant made two arguments for dismissal. First, defendant argued that count I should be dismissed under sections 2-615 and 2-619 on the ground that a claim of common-law retaliatory discharge is available only to at-will employees and that plaintiff fails to allege that she was an at-will employee at the time of her termination. Rather, she alleges that she was a contracted employee pursuant to an express, written contract for a specific term. Defendant attached to its motion copies of

plaintiff's employment contracts for the 2016-17 and 2017-18 school years. Defendant also attached signed and certified declarations by Father Bachner and Nancy Siemers, the Diocese's director of human resources, both of whom stated that plaintiff was a contracted employee, not an at-will employee. They further stated that, after being relieved of her duties as principal in June 2017, plaintiff continued to be paid all compensation due under the terms of the 2016-17 and 2017-18 employment contracts.

¶ 14   Defendant's second ground for dismissal pursuant to section 2-619 was that the first amendment precluded the trial court from hearing both of plaintiff's claims. Relying on *Hosanna-Tabor Evangelical Lutheran Church & School v. Equal Employment Opportunity Comm'n*, 565 U.S. 171 (2012), and other authorities, defendant argued that the first amendment to the United States Constitution (U.S. Const., amend. I) and article I, section 3, of the Illinois Constitution (Ill. Const. 1970, art. I, § 3) protect a religious institution's ability to select individuals appointed to speak for the church. Thus, where a plaintiff whose employment qualifies her as a "minister" files a lawsuit challenging the termination of her employment, a court must abstain from deciding the dispute. See *Hosanna-Tabor*, 565 U.S. at 194-95 (applying the "ministerial exception" to a former Catholic school teacher's employment discrimination claims). In support of its argument that plaintiff fulfilled a ministerial role, defendant cited Father Bachner's declaration, which described the ecclesiastical nature of plaintiff's job duties and stated that plaintiff, as principal, was "expected to serve as the religious and educational leader" of the school community.

¶ 15   Plaintiff filed a response to defendant's motion. In her supporting memorandum, plaintiff argued, *inter alia*, that the trial court was not constitutionally required to abstain from hearing her claims because the court could do so without entangling itself in the religious beliefs of the Catholic Church. Plaintiff further argued that *Hosanna-Tabor* was distinguishable because (1) unlike the plaintiff in *Hosanna-Tabor*, she was a lay principal who did not perform a ministerial function and (2) her retaliation and whistleblower claims were fundamentally different from the employment discrimination claims presented in *Hosanna-Tabor*. Finally, plaintiff argued in the alternative that it was premature for the court to determine the applicability of *Hosanna-Tabor* because the question of

whether an employee is providing a ministerial function is a fact-based inquiry best suited for summary judgment or trial.

¶ 16    After a hearing, the trial court dismissed with prejudice both counts of plaintiff's first amended complaint. As to count I, the trial court determined that the amended complaint failed to state a claim for retaliatory discharge because plaintiff was employed pursuant to a contract and "[c]ommon law retaliatory discharge claims may only be asserted by employees terminable at will." The trial court further determined that it must abstain from deciding both of plaintiff's claims in accordance with the doctrine of ecclesiastic abstention.

¶ 17    Plaintiff appealed, and the appellate court affirmed the trial court's dismissal of the first amended complaint with prejudice. 2019 IL App (3d) 180354. In so doing, the appellate court reasoned that plaintiff was not a secular employee but a "member of the clergy" and, therefore, that the ecclesiastical abstention doctrine barred review of plaintiff's claims. *Id.* ¶ 32. According to the appellate court,

> "due to the wide discretion provided to churches by the ecclesiastical abstention doctrine when managing its representatives, the Diocese could terminate [plaintiff], as a member of the clergy, for any reason without court interference, as review of that decision would involve court scrutiny of the Diocese's motivations, objectives, and principles." *Id.*

The appellate court declined to address the separate issue of whether a claim for common-law retaliatory discharge is available to a contractual employee. *Id.* ¶ 33. This appeal followed.

¶ 18                                    ANALYSIS

¶ 19                              I. Standard of Review

¶ 20    On appeal to this court, plaintiff argues that the trial court erred in dismissing both counts of her first amended complaint. A motion to dismiss under section 2-615(a) of the Code of Civil Procedure (735 ILCS 5/2-615(a) (West 2016)) challenges the legal sufficiency of a complaint by alleging defects on the face of the complaint. *Marshall*, 222 Ill. 2d at 429. In ruling on the motion, a court must determine whether the facts alleged in the complaint, viewed in the light most

favorable to the plaintiff and taking all well-pleaded facts as true, are sufficient to state a cause of action upon which relief may be granted. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 16. A court should not dismiss a complaint pursuant to this section unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery. *Marshall*, 222 Ill. 2d at 429.

¶ 21        Section 2-619 of the Code (735 ILCS 5/2-619 (West 2016)) provides a means for a defendant to obtain a summary dismissal of issues of law or easily proved issues of fact. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115 (1993). A motion to dismiss filed under subsection 2-619(a)(9) (735 ILCS 5/2-619(a)(9) (West 2016)) admits the legal sufficiency of the plaintiff's complaint but raises an affirmative defense or other matter that avoids the legal effect of or defeats the plaintiff's claims. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). The affirmative matter "must be apparent on the face of the complaint" or "be supported by affidavits or certain other evidentiary materials." *Id.* at 377.

¶ 22        The defendant bears the initial burden of establishing the existence of an affirmative matter by providing adequate affidavits or other supporting evidence. *Kedzie & 103rd Currency Exchange, Inc.*, 156 Ill. 2d at 116. Once the defendant satisfies its burden, the burden shifts to the plaintiff to establish that the defense is unfounded or requires the resolution of an essential element of material fact before it is proven. *Id.* Evidentiary facts asserted in a defense affidavit are deemed admitted unless the plaintiff submits a counteraffidavit to refute those facts. *Id.* All pleadings and supporting documents must be interpreted in the light most favorable to the nonmoving party. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 189 (1997). "If, after considering the pleadings and affidavits, the trial judge finds that the plaintiff has failed to carry the shifted burden of going forward, the motion may be granted and the cause of action dismissed." *Kedzie & 103rd Currency Exchange, Inc.*, 156 Ill. 2d at 116.

¶ 23        Upon review of the trial court's dismissal pursuant to section 2-619, the reviewing court must consider whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law. *Id.* at 116-17. Our standard of review for

dismissals under either section 2-615 or 2-619 is *de novo*. *Doe-3*, 2012 IL 112479, ¶ 16.

¶ 24    Before addressing the constitutional issues raised in this appeal, we will address any nonconstitutional issues upon which the trial court relied in dismissing the complaint. See *People v. Lee*, 214 Ill. 2d 476, 482 (2005) (courts should avoid reaching constitutional issues if a case can be decided on other, nonconstitutional grounds). The nonconstitutional basis for the trial court's dismissal of count I of the complaint was pursuant to section 2-615 for failure to state a legally sufficient claim upon which relief could be granted.

¶ 25                                    II. Retaliatory Discharge

¶ 26    Defendant argues that plaintiff's cause of action for common-law retaliatory discharge in count I was properly dismissed by the trial court because plaintiff was not an at-will employee at the time of her discharge. The tort of retaliatory discharge was first recognized by this court in 1978, one year prior to the legislature's adoption of the Whistleblower Act. *Blount v. Stroud*, 232 Ill. 2d 302, 314 (2009) (citing *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172 (1978)). "The tort is an exception to the general rule that an 'at-will' employment is terminable at any time for any or no cause." *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 128 (1981). Acknowledging the harshness to employees resulting from the at-will employment rule, this court recognized a cause of action for retaliatory discharge. The intent was to strike a balance "among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out." *Id.* at 129.

¶ 27    "In Illinois, in order to establish a tort claim for retaliatory discharge, a plaintiff must show (1) that she has been discharged; (2) in retaliation for her activities; and (3) that the discharge violates a clear mandate of public policy." *Bajalo v. Northwestern University*, 369 Ill. App. 3d 576, 580 (2006). Illinois courts evaluating retaliatory discharge claims have refused to recognize a claim for any injury short of "actual discharge." *Id.* at 582; see also *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 163 (1992) (declining to extend cause of action to " 'constructive discharge' "). "Actual discharge" means termination of an "at-will" employee—one whose employment has a nonspecific duration that can be

terminated for any reason—*not* nonrenewal of a fixed-term employment contract. *Krum v. Chicago National League Ball Club, Inc.*, 365 Ill. App. 3d 785, 788-89 (2006). For this reason, our appellate court has consistently refused to extend the reach of the retaliatory discharge tort to cover the nonrenewal of a fixed-term contract. *Id.* at 789; *Taylor v. Board of Education of the City of Chicago*, 2014 IL App (1st) 123744, ¶¶ 34-35; *Bajalo*, 369 Ill. App. 3d at 581-85; see also *Darchak v. City of Chicago Board of Education*, 580 F.3d 622, 628 (7th Cir. 2009).

¶ 28     Plaintiff contends that this court has expanded the tort of retaliatory discharge to include contractual employees, citing *Midgett v. Sackett-Chicago*, *Inc.*, 105 Ill. 2d 143 (1984). That case held that an action for retaliatory discharge was available to union employees independent of the provisions in their collective bargaining agreements. *Id.* at 150. *Midgett* is distinguishable, however, because this case does not involve a collective bargaining agreement. Moreover, the plaintiffs in that case were actually discharged from their employment. *Id.* at 146-47. In this case, by contrast, after plaintiff's duties as principal were terminated, she continued to be paid according to the terms of her contract until the contract's expiration date.

¶ 29     Plaintiff admits on the face of her complaint that her employment was subject to a contract. There is no allegation or evidence in the record that plaintiff was an at-will employee. Accordingly, she is unable to state a claim for common-law retaliatory discharge under the law in Illinois. We therefore hold that the retaliatory discharge count was properly dismissed by the trial court. Thus, although we affirm the part of the appellate court's judgment that affirmed the dismissal of count I, we do so on different grounds.

¶ 30                                III. Whistleblower Act

¶ 31     Plaintiff's remaining claim in count II alleges a violation of the Whistleblower Act. Defendant argues for the first time in this court that plaintiff's whistleblower claim is insufficient as a matter of law. Specifically, defendant contends that plaintiff cannot be considered a "whistleblower" within the meaning of the statute because she reported to authorities the criminal conduct of a third party rather than that of her employer. Plaintiff responds that defendant has forfeited this argument by failing to raise it in the trial court. We disagree. It is well established that " 'the appellee may urge any point in support of the judgment on appeal, even though not

directly ruled on by the trial court, so long as the factual basis for such point was before the trial court.' " *Beahringer v. Page*, 204 Ill. 2d 363, 370 (2003) (quoting *Shaw v. Lorenz*, 42 Ill. 2d 246, 248 (1969)). The record before us provides a sufficient basis to determine whether defendant's argument has merit.

¶ 32 The Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2016)) protects employees who call attention in one of two specific ways to illegal activities. *Sardiga v. Northern Trust Co.*, 409 Ill. App. 3d 56, 62 (2011). It applies to employees who either report the illegal activity to a government agency or refuse to participate in the illegal activity. *Id*. Relevant to this case, subsection 15(b) of the Whistleblower Act states: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b) (West 2016).

¶ 33 Defendant argues that plaintiff does not qualify as a "whistleblower" under the Whistleblower Act because she was not reporting the illegal activities of her employer to the police. The plain language of the Whistleblower Act does not support this interpretation. The Whistleblower Act states that it applies to employees retaliated against by their employers for reporting criminal activity to government or law enforcement agencies. There are no other requirements or exceptions written into the Whistleblower Act. *Brame v. City of North Chicago*, 2011 IL App (2d) 100760, ¶ 8. Nothing in the statutory language suggests that the legislature intended to limit the Whistleblower Act's protections to those situations in which an employee blows the whistle on her employer. See *Coffey v. DSW Shoe Warehouse, Inc.*, 145 F. Supp. 3d 771, 777 (N.D. Ill. 2015) (applying the Whistleblower Act to an employee's disclosure of illegality by a third party). As one court explained, "[h]ad state legislators truly wished to limit the [Whistleblower] Act's reach as Defendant proposes, they could have done so simply by referring in the statutory text to information that 'discloses the *employer's* violation,' rather than 'discloses *a* violation.' " (Emphases in original.) *Id.* (citing 740 ILCS 174/15 (West 2014)).

¶ 34 This court will not read the limitation suggested by defendant into the clear, unambiguous language of the statute. See *Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.*, 2014 IL 115526, ¶ 24 ("It is

improper for a court to depart from the plain statutory language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent."). Accordingly, we reject defendant's argument with respect to the legal sufficiency of plaintiff's whistleblower claim.

¶ 35                                  IV. First Amendment Doctrines

¶ 36        Turning to the constitutional issues, defendant's motion to dismiss raises two separate, albeit intertwined, judicially created doctrines as grounds for dismissal— the ecclesiastical abstention doctrine and the ministerial exception. Both doctrines are rooted in the first amendment to the United States Constitution, as applied to the states through the fourteenth amendment (U.S. Const., amends. I, XIV). The first amendment provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ***." U.S. Const., amend. I. The corresponding provision in our state constitution similarly provides in part:

> "The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever be guaranteed ***. No person shall be required to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious denomination or mode of worship." Ill. Const. 1970, art. I, § 3.

Illinois courts construe the protections in article I, section 3, as coextensive with those in the first amendment. See *People v. Falbe*, 189 Ill. 2d 635, 645 (2000).

¶ 37        If either ecclesiastical abstention or the ministerial exception applies to plaintiff's whistleblower claim, the trial court's dismissal of count II should be affirmed. In conducting this analysis, we note that under the supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2) we are bound by the United States Supreme Court's application and construction of the first amendment. See *In re N.G.*, 2018 IL 121939, ¶ 41.

¶ 38                              A. Ecclesiastical Abstention

¶ 39        The ecclesiastical abstention doctrine provides that "civil courts may not determine the correctness of interpretations of canonical text or some decisions relating to government of the religious polity; rather, courts must accept as given whatever the religious entity decides." *Duncan v. Peterson*, 408 Ill. App. 3d 911, 915 (2010) (citing *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976)).

¶ 40        The principles underlying ecclesiastical abstention were first enunciated by the United States Supreme Court in 1871 in a case involving a church property dispute. *Watson v. Jones*, 80 U.S. 679 (1871). In that case, a religious governing body had declared a proslavery faction of the church illegitimate and excluded it from membership, effectively designating the antislavery faction as the "true" church and rightful owner of the church property. *Id.* at 684-85, 722. The Supreme Court held that the case was inappropriate for adjudication by civil courts. *Id.* at 734. The Court reasoned that, "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.* at 727. The Court further held that civil courts have no authority to decide a dispute whose subject matter is "strictly and purely ecclesiastical in its character *** a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id.* at 733.

¶ 41        The Supreme Court later characterized *Watson*'s principles as being grounded in the first amendment. See *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 115-16 (1952); see also *Bruss v. Przyblo*, 385 Ill. App. 3d 399, 408 (2008) (citing cases). In *Kedroff*, the Court was asked to determine which of two competing church bodies had the right to use and occupy a cathedral in New York City. *Kedroff*, 344 U.S. at 95. The Court concluded that it should abstain from deciding the dispute because it was "strictly a matter of ecclesiastical government" that turned on the power of the Russian Orthodox Church to appoint the ruling hierarch of the archdiocese of North America. *Id.* at 115. In doing so, the Court stated that *Watson* "radiates *** a spirit of freedom for

religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 116.

¶ 42 More than 20 years later, the Supreme Court heard a case involving a bishop who was removed from his position in the church for misconduct and asked the civil courts to declare his removal invalid because it violated the church's constitution and bylaws. *Milivojevich*, 426 U.S. at 707-08. The Court held that an ecclesiastical tribunal was the appropriate body to resolve the dispute and, therefore, that the courts should abstain from deciding the case. *Id.* at 709. According to the Court's analysis,

"where resolution of [a] dispute[ ] cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them." *Id.*

The Court held that this obligation of abstention extends to property disputes that require the resolution of underlying controversies over religious doctrine, as well as disputes over church polity and church administration. *Id.* at 710.

¶ 43 Ecclesiastical abstention is merely a qualified limitation on a court's ability to decide disputes involving religious organizations, however; it is not an absolute bar. *Puri v. Khalsa*, 844 F.3d 1152, 1164 (9th Cir. 2017). "It was not the intent of [the first amendment] *** that civil and property rights should be unenforceable in the civil courts simply because the parties involved might be the church and members, officers, or the ministry of the church." *Bodewes v. Zuroweste*, 15 Ill. App. 3d 101, 103 (1973). Accordingly, the Supreme Court has held that, where " 'neutral principles of law,' " *i.e.*, "objective, well-established concepts of *** law familiar to lawyers and judges" can be applied and there is no danger of "entanglement in questions of religious doctrine, polity, and practice," the first amendment does not bar a civil court from resolving the case. *Jones v. Wolf*, 443 U.S. 595, 597, 603 (1979). This analysis is commonly known as the " 'neutral principles of law' " approach. *Jackson v. Mount Pisgah Missionary Baptist Church Deacon Board*, 2016 IL App (1st) 143045, ¶ 50. Under this approach, a court may examine pertinent charters, constitutions, bylaws, deeds, state statutes, and any

- 13 -

other evidence to resolve the dispute in the same way it would a secular dispute. *Id.*

¶ 44                                    B. Ministerial Exception

¶ 45       In its first amendment jurisprudence, "[t]he Supreme Court has long recognized religious organizations' broad right to control the selection of their own religious leaders." *Puri*, 844 F.3d at 1157; see *Kedroff*, 344 U.S. at 116 (the "[f]reedom to select the clergy *** must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference"); *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16 (1929) (decisions of church authorities as to whether an individual possesses the "essential qualifications" to serve as a minister "are accepted in litigation before the secular courts as conclusive"). This principle underlies what the federal courts have dubbed the "ministerial exception."

¶ 46       "The ministerial exception is best understood as a narrow, more focused subsidiary of the ecclesiastical abstention doctrine ***." *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 604 (Ky. 2014). It is a judicially created principle that allows religious organizations to select and control their ministers without judicial review or government interference. See *Puri*, 844 F.3d at 1158. The exception has been applied most often in the context of federal employment discrimination lawsuits filed by ministers against religious organizations. The lower federal courts have consistently held that such claims must be dismissed at the risk of interfering with internal church matters. See *Hosanna-Tabor*, 565 U.S. at 188 & n.2 (citing cases).

¶ 47       In *Hosanna-Tabor*, a unanimous Supreme Court formally recognized the ministerial exception for the first time. *Id.* at 188. In so doing, the Court clarified that the ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." *Id.* at 195 n.4. The Court explained that both the establishment clause and the free exercise clause of the first amendment (U.S. Const., amend. I) grant the power to religious organizations " 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' " *Hosanna-Tabor*, 565 U.S. at 186 (quoting *Kedroff*, 344 U.S. at 116). The freedom from state interference extends to a "church's determination of who can act as its ministers." *Id.* at 185. The Court explained:

- 14 -

"The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 188-89.

¶ 48    The Court emphasized that a religious organization's reason for terminating a minister's employment is irrelevant to whether the ministerial exception applies. As the Court explained, "[t]he purpose of the [ministerial] exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful *** is the church's alone." *Id.* at 194-95. In accord with these principles, *Hosanna-Tabor* held that the first amendment barred a discrimination claim filed under the Americans With Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 *et. seq.* (2006)) by a teacher who was fired from her position at a religious school. *Hosanna-Tabor*, 565 U.S. at 190. The Court determined, based on the particular facts before it, that the plaintiff in that case qualified as a "minister" whose claims were subject to the ministerial exception. Thus, the first amendment required dismissal of the employment discrimination suit filed by the plaintiff against her religious employer. *Id.* at 194.

¶ 49    In a recent decision, *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. ___, 140 S. Ct. 2049 (2020), the Supreme Court affirmed the principles it had set forth in *Hosanna-Tabor*. There, the Court applied the ministerial exception to claims filed by two teachers alleging discrimination under the ADA and the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 *et seq.* (2012)) against their former Catholic school employers. *Our Lady of Guadalupe School*, 591 U.S. at ___, ___, 140 S. Ct. at 2057-58, 2066. The Court reiterated that, under the ministerial exception, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other

religious institutions." *Id.* at \_\_\_, 140 S. Ct. at 2060. According to the Court's reasoning, the ministerial exception is intended to "preserve a church's independent authority" to "select, supervise, and if necessary, remove a minister without interference by secular authorities." *Id.* at \_\_\_, 140 S. Ct. at 2060-61. "Without that power," the Court held, "a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Id.* at \_\_\_, 140 S. Ct. at 2060.

¶ 50                            C. Application of the Ministerial Exception

¶ 51        We first discuss whether the ministerial exception, the narrower of the two first amendment doctrines, applies to plaintiff's whistleblower claim. Plaintiff argues that the ministerial exception is inapplicable to her whistleblower claim because her claim involves public policies and societal interests beyond the protection of an individual's right to be free from employment discrimination. See *Larsen v. Provena Hospital*, 2015 IL App (4th) 140255, ¶ 47 (the intent of whistleblower laws is to reduce crime and protect people from harm (citing *Sutherland v. Norfolk Southern Ry. Co.*, 356 Ill. App. 3d 620, 627 (2005))). For this reason, plaintiff argues, defendant should not be shielded from liability in this case.

¶ 52        The United States Supreme Court has not addressed application of the ministerial exception to a whistleblower claim. In *Hosanna-Tabor*, the Court expressly stated that its holding was limited to "an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." *Hosanna-Tabor*, 565 U.S. at 196. The Court further stated that it "express[ed] no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." *Id.* Moreover, *Our Lady of Guadalupe School* did not answer the questions that *Hosanna-Tabor* deliberately left for another day. The focus of that decision was whether the plaintiffs qualified as "ministers," bringing them within the scope of the ministerial exception. See *Our Lady of Guadalupe School*, 591 U.S. at \_\_\_-\_\_\_, 140 S. Ct. at 2063-69. The Court said nothing about extending the ministerial exception to claims other than those alleging employment discrimination.

¶ 53        Thus, we must decide as a matter of first impression in this State whether plaintiff's whistleblower claim is subject to dismissal based on the rule announced in *Hosanna-Tabor*. The federal courts provide some guidance on this issue.

¶ 54        The federal circuit courts reason that a claim that alleges an adverse employment action by a minister against a church directly implicates a church's constitutional authority to select its own ministers. *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir. 2000); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 961-62 (9th Cir. 2004); *Petruska v. Gannon University*, 462 F.3d 294, 307-08 (3d Cir. 2006). Courts may not interfere with this authority at the risk of "entangling the government 'in questions of religious doctrine, polity, and practice.' " *Gellington*, 203 F.3d at 1304 (quoting *Jones*, 443 U.S. at 603). *Petruska* summed up the rule thusly: "The ministerial exception, as we conceive of it, operates to bar *any claim*, the resolution of which would limit a religious institution's right to select who will perform particular spiritual functions." (Emphasis added.) *Petruska*, 462 F.3d at 307. The Ninth Circuit expressly applied the same reasoning to state retaliation claims, stating that " '[j]ust as there is a ministerial exception to Title VII, there must also be a ministerial exception to any state law cause of action that would otherwise impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers.' " *Elvig*, 375 F.3d at 969 (quoting *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999)).

¶ 55        In this case, plaintiff's whistleblower claim challenges the Diocese's decision to terminate her employment. The essence of plaintiff's claim is the allegation that she was wrongfully discharged from her position as principal of St. Raphael. Her action bears directly on the Diocese's right to select its ministers, assuming plaintiff qualifies as a minister. *Puri*, 844 F.3d at 1158 (holding that any claim with an associated remedy requiring a church to employ a minister, *e.g.* reinstatement, interferes with the church's constitutionally protected right to choose its ministers). The Whistleblower Act allows a plaintiff to file a civil action against her employer "for all relief necessary to make the employee whole," including but not limited to reinstatement, backpay with interest, and compensation for any damages sustained as a result of the violation, including litigation costs, expert witness fees, and reasonable attorney fees. 740 ILCS 174/30 (West 2016).

¶ 56    Although plaintiff in this case is seeking money damages, not reinstatement to her former position, the Supreme Court has held that this is a distinction without a difference. In *Hosanna-Tabor*, the Court held that the ministerial exception bars relief for damages in the form of frontpay, backpay, compensatory damages, punitive damages and attorney fees because such damages "would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination." *Hosanna-Tabor*, 565 U.S. at 194. In light of the consistent body of authority discussed above, we decline to hold that plaintiff's whistleblower claim is exempt from application of the ministerial exception. We note, however, that our holding is confined to the claim at issue in this case. We express no opinion on whether the exception bars a suit filed in any case other than the one before us.

¶ 57    Having found that plaintiff's whistleblower claim is not exempt from application of the ministerial exception, we turn to the question of whether plaintiff qualifies as a "minister." The Supreme Court holds that there is no "rigid formula" for determining who falls within the exception. *Hosanna-Tabor*, 565 U.S. at 190. Rather, "all the circumstances of [plaintiff's] employment" should be considered. *Id.* Furthermore, the significance of certain factors in one case does not mean that the same factors "must be met—or even that they are necessarily important—in all other cases." *Our Lady of Guadalupe School*, 591 U.S. at ___, 140 S. Ct. at 2063.

¶ 58    In *Hosanna-Tabor*, the Court examined evidence submitted by the defendant, Hosanna-Tabor Evangelical Lutheran Church and School, in its motion for summary judgment to determine whether the plaintiff, Cheryl Perich, was a minister covered by the ministerial exception. The Court found that the defendant "held Perich out as a minister, with a role distinct from that of most of its members." *Hosanna-Tabor*, 565 U.S. at 191. Plaintiff was classified as a "called teacher" and, as such, was awarded the title of commissioned minister of religion. *Id.* at 178, 191. This title required a "significant degree of religious training followed by a formal process of commissioning." *Id.* at 191. Over the course of six years, plaintiff had to complete eight college-level courses in church doctrine and other religious matters, submit a detailed petition requesting an endorsement from her local synod district, and pass an oral examination by a faculty committee at a Lutheran college. *Id.* Once plaintiff completed these requirements, "she was commissioned as a minister only upon election by the congregation, which recognized God's call to her to teach."

*Id.* The Court found that plaintiff also "held herself out as a minister of the Church" by accepting the formal call to religious service, claiming a special housing allowance on her federal taxes available only to ministers, and stating in a letter that " 'God is leading me to serve in the teaching ministry.' " *Id.* at 191-92.

¶ 59 Furthermore, the Court found, plaintiff's job duties "reflected a role in conveying the Church's message and carrying out its mission." *Id.* at 192. Plaintiff was charged by defendant with " 'lead[ing] others toward Christian maturity' and 'teach[ing] faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church.' " *Id.* Plaintiff fulfilled these duties by leading her students in prayer three times a day, teaching them religion four days a week, taking them to a schoolwide chapel service once a week, and organizing and leading the chapel service about twice a year. In her last year of teaching, she also led her students in a brief devotional exercise each morning. The Court summarized plaintiff's duties as follows: "As a source of religious instruction, Perich performed an important role in transmitting the Lutheran faith to the next generation." *Id.* For these reasons—plaintiff's formal title, the substance reflected in her title, her use of that title, and the religious functions she performed for the church—the Court concluded that plaintiff was a minister covered by the ministerial exception. *Id.* In so doing, the Court rejected the idea that the amount of time plaintiff spent performing religious functions (approximately 45 minutes of each workday) was determinative of her status. *Id.* at 193-94. The Court held that this factor, while relevant, could not be considered in isolation and without regard to the nature of plaintiff's religious role and duties. *Id.* at 194.

¶ 60 In *Our Lady of Guadalupe School*, the majority opinion emphasized that a plaintiff's formal title is not conclusive of whether he or she is a minister. *Our Lady of Guadalupe School*, 591 U.S. at ___, 140 S. Ct. at 2063-64. It also cautioned courts against treating the factors in *Hosanna-Tabor* as "checklist items to be assessed and weighed against each other in every case." *Id.* at ___, 140 S. Ct. at 2066-67. Rather, the majority said, "[w]hat matters, at bottom, is what an employee does." *Id.* at ___, 140 S. Ct. at 2064. The majority found there was "abundant record evidence" that the religious duties performed by both plaintiffs qualified them as ministers:

"Educating and forming students in the Catholic faith lay at the core of the mission of the schools where they taught, and their employment agreements and faculty handbooks specified in no uncertain terms that they were expected to help the schools carry out this mission and that their work would be evaluated to ensure that they were fulfilling that responsibility. As elementary school teachers responsible for providing instruction in all subjects, including religion, they were the members of the school staff who were entrusted most directly with the responsibility of educating their students in the faith. And not only were they obligated to provide instruction about the Catholic faith, but they were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith. They prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities. Their positions did not have all the attributes of Perich's. Their titles did not include the term 'minister,' and they had less formal religious training, but their core responsibilities as teachers of religion were essentially the same. And both their schools expressly saw them as playing a vital part in carrying out the mission of the church ***." *Id.* at ___, 140 S. Ct. at 2066.

Based on this evidence, the majority concluded that both plaintiffs fell within the ministerial exception. *Id.* at ___, 140 S. Ct. at 2066.[1] Accordingly, it reversed the rulings of the United States Court of Appeals for the Ninth Circuit, which had reversed the district courts' orders entering summary judgment for the defendants. *Id.* at ___, 140 S. Ct. at 2069.

¶ 61  In the instant case, the evidentiary materials in the record that are pertinent to whether plaintiff was a minister consist of plaintiff's first amended complaint, her 2016-17 employment contract, and Father Bachner's declaration. In her complaint, plaintiff describes her job duties as primarily secular in nature. She alleges that one of the main reasons she was hired as principal was "bringing order to the school administration." She alleges that, during her employment as principal, she

---

[1]Justice Sotomayor dissented. *Our Lady of Guadalupe School*, 591 U.S. at ___, 140 S. Ct. at 2071-82 (Sotomayor, J., dissenting, joined by Ginsburg, J.). She argued that the majority's classification of the plaintiffs as ministerial was incorrect and "profoundly unfair," where the record showed that plaintiffs "taught primarily secular subjects, lacked substantial religious titles and training, and were not even required to be Catholic." *Id.* at ___, ___, 140 S. Ct. at 2072, 2082.

"successfully designed and implemented a number of programs to improve the education experience for her students." These included piloting an online communication program for parents and teachers, adopting a new science curriculum, redesigning procedures for reading and learning behavior specialists, initiating an anti-bullying campaign, and introducing several data-driven curriculum changes. Plaintiff alleges she was active in the community, often attending events on behalf of St. Raphael to encourage more families to send their children to the school. She also appeared on local podcasts and community television and hosted open houses at the school.

¶ 62 Plaintiff's 2016-17 employment contract describes plaintiff as a "lay principal" and a "lay individual." It states that her employment is subject to the policies, rules, and regulations in the school personnel handbook established by the Joliet Diocesan Board of Education. It states that plaintiff "agrees to act consistently in accordance with the stated philosophy, objectives and policies of the Diocesan Board of Education and the Parish School Board, and to work cooperatively with the pastor and others in the school." It also states that plaintiff may be dismissed for, among other things, "immorality, or any public act, or publication of any act, not consistent with the philosophy of the SCHOOL and/or with the religious and moral teaching and philosophies of the Roman Catholic Church." In addition, the contract requires plaintiff to "immediately report to the pastor any change in [her] religious affiliation."

¶ 63 In his declaration, Father Bachner states that the principal of St. Raphael is "expected to serve as the religious and educational leader[ ]" of the school community. He describes the principal's job duties as follows:

"Among other responsibilities, principals are required to provide an identifiably Catholic atmosphere in the school, visit classrooms and supervise teachers in their provision of a Catholic education, establish student-instructional programs that include regular religious education, and develop and participate in religious programming for staff. Critically, principals are expected to represent the Diocese on the local school board, before parents, the parish community, and the public. Principals are considered an 'Agent of Communication' chiefly responsible for school community relations on behalf of the Diocese.

\*\*\*

An essential, indeed indispensable, responsibility which Mrs. Rehfield held as principal of the School (and which all principals of the School have held as among their most critical duties) was to serve as a lay educational minister to ensure, under my direction and guidance as pastor, the spiritual and religious education, development and growth of all pupils and staff in the principles of the Roman Catholic faith, as well as the students' and staff's adherence to those same Roman Catholic principles."

¶ 64    Father's Bachner's declaration includes excerpts from the Diocese's school policy handbook, incorporated by reference into plaintiff's employment contract. The handbook states that the principal "bears the chief responsibility for organizing and implementing school community relations" and that the pastor "delegates to the principal the operation of the school." It states that a person seeking a position as a principal for the Diocese "shall be a committed, practicing Catholic." It lists responsibilities and duties of the principal, including but not limited to

"providing an atmosphere in the school which is identifiably Catholic[;] developing and participating in ongoing programs to insure religious and professional growth of the staff[;] establishing an instructional program which includes religious education to meet the needs of students[;] assisting teachers in achieving the goals of Catholic education through supervision and classroom visitation[;] hiring qualified teachers and providing them with effective leadership; evaluating teacher performance according to diocesan procedures[;] fostering good communication with parents, parish community[,] and other publics to promote good will[;] attending professional meetings, diocesan meetings[,] and regional meetings[;] sending required reports and requested information to the Catholic Schools Office and/or other appropriate agencies[;] maintaining current student and school records[;] developing the school budget[;] serving as the executive officer of the local school board[;] giving frequent reports to the pastor, local board[,] and parents regarding progress of the school, its activities[,] and its students[;] insuring that maintenance of the building, health, safety[,] and well-being of students and teachers be maintained."

¶ 65    In her response to defendant's motion to dismiss, plaintiff did not submit any affidavits or other proof to refute the factual allegations in Father Bachner's

declaration. See 735 ILCS 5/2-619(c) (West 2016). If a defendant presents an adequate affidavit in support of its defense in a section 2-619 motion to dismiss, the burden then shifts to the plaintiff. *Kedzie & 103rd Currency Exchange, Inc.*, 156 Ill. 2d at 116. Where, as here, the plaintiff fails to file a counteraffidavit or other proof to refute the facts asserted in the defendant's affidavit, this court will deem those facts admitted. *Id.*

The evidence in the record establishes that plaintiff was required to be a practicing Catholic and to abide by the Diocesan handbook. In her role as principal of St. Raphael, she was expected to "provide an identifiably Catholic atmosphere in the school, visit classrooms and supervise teachers in their provision of a Catholic education, establish student-instructional programs that include regular religious education, and develop and participate in religious programming for staff." Based on this evidence, and in the absence of evidence to the contrary, we see no meaningful difference between plaintiff's role and those of the teachers in *Our Lady of Guadalupe School*. In both that case and the one at bar, the plaintiffs held important roles in fostering the religious education of the students at their respective schools. Moreover, as principal, plaintiff was expected to represent not only the school but also the Diocese to parents, the parish community, and the public. Thus, although her formal title ("lay principal") does not necessarily indicate a religious role, it is apparent from the record that plaintiff's job duties entailed numerous religious functions in furtherance of the school's Catholic mission. See *Fratello v. Archdiocese of New York*, 863 F.3d 190, 206 (2d Cir. 2017). Accordingly, we hold there is sufficient evidence in the record to conclude that plaintiff was a minister and, thus, that the ministerial exception bars her whistleblower claim.

## CONCLUSION

For the foregoing reasons, the appellate court's judgment affirming the dismissal of plaintiff's complaint is affirmed.

Affirmed.

JUSTICE CARTER took no part in the consideration or decision of this case.