NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 220438-U

NO. 4-22-0438

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 4, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| SERAFINO SAURO, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Peoria County |
| JEFFREY S. LEMAN, M.D., Individually and on | ) | No. 21L87 |
| Behalf of THE BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS COLLEGE OF | ) | |
| MEDICINE and METHODIST MEDICAL CENTER | ) | Honorable |
| OF ILLINOIS, | ) | Michael D. Risinger, |
|     Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in dismissing plaintiff's claims against defendants under sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2020)).

¶ 2    Plaintiff, Serafino Sauro, filed a seven-count complaint against defendants— Jeffrey S. Leman, M.D.; the Board of Trustees of the University of Illinois College of Medicine (University); and Methodist Medical Center of Illinois (Methodist)—challenging his dismissal from a medical residency program. (We note that although plaintiff named the "University of Illinois College of Medicine" as a defendant in the matter, the proper party to be named in a suit against the University of Illinois is the Board of Trustees of the University of Illinois. See 110 ILCS 305/1 (West 2020)). The trial court dismissed all seven counts on defendants' motions, and plaintiff appeals. We affirm.

## I. BACKGROUND

¶ 4 In April 2021, plaintiff filed the complaint at issue on appeal. Against Dr. Leman and the University, he raised claims for a common law writ of *certiorari* for review of the underlying proceedings that resulted in his dismissal from his residency program (count I), breach of contract (count II), and tortious interference with an existing business relationship (count IV). Against solely Dr. Leman, he raised claims for intentional infliction of emotional distress (count VI) and tortious interference with a prospective business relationship (count VII). Finally, against Methodist, he asserted claims for breach of contract (count III) and retaliatory discharge (count V). To his complaint, plaintiff attached the following exhibits: (1) a "House Staff Manual" approved by the University, (2) a "Residency Agreement" entered into between Methodist and plaintiff in April 2018, and which covered an employment period from July 1, 2018, to June 30, 2019, (3) a July 2020 notice of plaintiff's dismissal from his residency program, and (4) written decisions relating to plaintiff's appeal of his dismissal from the residency program through the University's appeals process.

¶ 5 Plaintiff's complaint and its exhibits reflect the following factual background. The University operates a medical school with medical residency programs. Students enrolled in a University residency program are hired by Methodist to perform medical services as resident physicians. Requirements of the residency programs are set forth in the University's House Staff Manual. Additionally, as part of their employment, residents enter into a Residency Agreement with Methodist, which sets forth the details of the employment relationship. The University's House Staff Manual is also incorporated into the Residency Agreement.

¶ 6 Relevant to this appeal, the House Staff Manual provides that the University is responsible for the educational aspects of its residency programs, while Methodist is responsible

for employing residents and providing a learning environment that allows them to participate in patient care under the supervision of University faculty. The manual states that to see patients, a resident must have either a temporary certificate or a permanent license. With only a temporary certificate, "[i]t is illegal to practice medicine outside of the residency/fellowship-training program." Additionally, "to continue their employment by [Methodist] and their enrollment in a residency/fellowship program, [residents] must remain in good standing with both institutions."

¶ 7    Each residency program has a University faculty member appointed as a program director. The program director has "authority and accountability for the overall program, including compliance with all applicable program requirements." The House Staff Manual states that a program director "must have responsibility, authority, and accountability for" matters including the selection, evaluation, promotion, discipline, and supervision of residents.

¶ 8    The House Staff Manual identifies "[p]rofessionalism" as a responsibility of residents. Lapses in professionalism may subject a resident to action by his or her program director. In particular, residents must comply with a dress code, violations of which "are considered infractions of professionalism." Regarding the appropriate standard of dress for residents, the House Staff Manual states as follows:

> "The House Staff uniform is a blue pinstriped laboratory coat with [University] and Family Medicine or Psychiatry insignias. Clean clothing consistent with [Methodist's] Dress Code Policy and a well-kept house staff uniform coat reflect a concern for one's patient as well as one's self."

(The substance of Methodist's dress code policy was not set forth in plaintiff's complaint or his exhibits.)

¶ 9    Disciplinary action for the violation of hospital rules and policies includes

educational intervention, probation, suspension, and dismissal from the residency program. The House Staff Manual defines probation as "a corrective action that notifies the [resident] of specific deficiencies that must be corrected in a stated period of time." A resident may be put on probation by his or her program director. Each probationary period requires a conference between the resident and the program director, along with a letter to the resident describing the terms of probation. At the end of a probationary period, a resident may be removed from probation, placed on another period of probation, informed that he or she will not be offered a Resident Agreement after the expiration of their current agreement, or entered into the dismissal process.

¶ 10        The House Staff Manual defines a "dismissal" as "the discharge of a [resident] from the program even though he/she has signed a [Resident] Agreement." Grounds for dismissal include, but are not limited to: (1) a resident's failure to comply with the law, (2) a resident's failure "to meet or advance in any of the competencies," including professionalism, "at a rate commensurate with [the resident's] training level," and (3) egregious behavior.

¶ 11        From 2018 to 2020, plaintiff was enrolled in the University's family medicine residency program. Through that program, he was hired by Methodist to perform medical services as a resident physician. Dr. Leman was employed by the University and was plaintiff's program director.

¶ 12        In March 2020, plaintiff was placed on a period of probation in his residency program. In June 2020, his probationary period was extended for two months "for ongoing professionalism concerns." In July 2020, plaintiff was given a "Formal Notice of Dismissal," signed by Dr. Leman, informing him that he was being dismissed from the family medicine residency based on violations of the terms of his probation extension. The grounds for dismissal were listed as disruptive behaviors at a patient handoff and dress code violations. Regarding the

latter grounds, the notice stated as follows:

"2) Violation of Dress Code.

    a.    This was witnessed by me (Dr. Jeffrey Leman) on July 6 and July 7, 2020.

    b.    On Monday July 6, you were seen in the resident lounge wearing scrub bottoms and a long sleeved Under Armor T-shirt. Various faculty had spoken to you in the past about this very same shirt. I reminded you that this was not appropriate dress code and you replied that you had an appropriate pullover that you would use if you were out on the floor seeing patients. You were reminded that wearing the pullover was essential.

    c.    The next day, on the morning of Tuesday, July 7, I was in a patient room *** and you walked in wearing scrubs and a short-sleeved UA T-shirt, with no lab coat or pullover.

    d.    When confronted shortly thereafter you said that you had initially gone to the cafeteria but then went to the patient rooms.

        i.    It is an expectation that residents will be in dress code when going to non-clinical areas of the hospital, such as the cafeteria.

3) The issue of dress code was one that has been repeatedly violated, and while this does not lead to direct patient harm, seems to demonstrate disregard to professionalism issues to which you have been warned specifically and on far more than one occasion.

a. On May 26th, you came to your semi-annual review with the program director wearing inappropriate footwear while on probation, which I later addressed this with you.

b. Dr. Andrews has had more than one conversation with you about dress code.

These are not isolated incidents, nor are they the only violations of the terms of your probation. You have been afforded ample opportunity to correct your behavior, and while you have made progress in the areas of communication and patient care, the professionalism concerns remain and are still happening at an unacceptable frequency."

¶ 13 Plaintiff sought review of his dismissal through the University's three-level appeals process as set forth in the House Staff Manual. The first level of that process involved a hearing before a committee, which was required to consist of at least three faculty members from the resident's department. The committee must convene within 14 days of the receipt of a resident's written request for a hearing and notice of the date, time, and place of the hearing must be given to the resident no fewer than 72 hours in advance of the hearing. Both the resident and the department head could attend the hearing and present witnesses and other evidence. The House Staff Manual states "[e]ach party shall be permitted to review all materials submitted to the Committee during the hearing." Additionally, the committee has "the sole right to determine what information, materials and/or witnesses are relevant to the proceedings" and to "consider only that which they deem to be relevant." The matter is decided by a majority vote of the committee, and the committee must provide both the resident and the department head with a written statement of its decision. "If written materials are submitted to the Committee, such materials shall be appended

to the Committee's report."

¶ 14     Relative to plaintiff's case, the first-level hearing committee issued a written decision on August 25, 2020. The decision stated the committee met on August 18, 2020. Plaintiff appeared at the hearing with counsel, and both he and Dr. Leman presented witnesses and other evidence. The decision showed that regarding his alleged dress code violations, plaintiff presented the following arguments:

> "[Plaintiff] stated that the residency dress code policy was not well defined nor universally applied with other residents. In addition, he noted that the dress code incident in question occurred during a patient care transition period. He felt that Dr. Leman was both vague and strict in enforcing the terms of his probation, and that the cited occurrences did not rise to the level of dismissal for violating the terms of his probation."

The three-person committee upheld plaintiff's dismissal. As to the issue of dress code violations, it stated as follows:

> "The dress code issue, while appearing minor, is also relevant. [Plaintiff's] defense that he had violated the policy before without getting in trouble (as had others), doesn't negate the infraction. Once he was told of the issue, he still broke the policy. His defense that these infractions did not impact patient care does not excuse the rule violation, especially in light of his probationary status. The fact that he had finished his rounds and was going back to check on the patient again indicates he was still acting in a professional capacity with the patient. The terms of his extended probation were made very strict by program leadership, in large part because he had already violated the original probation agreement. He was aware of this when

he signed the extended probation [agreement].”

¶ 15　　　　The second level of the University's appeal process provided for review of the first-level committee's decision with "the Associate Dean for Graduate Medical Education" (Associate Dean). In particular, the House Staff Manual provides as follows:

> "A Resident may appeal the Committee's decision to the Associate Dean \*\*\* within [10] days of issuance of the Committee's decision. The Associate Dean shall review the Committee's decision and any documentation submitted to the Committee, and may conduct his/her own investigation of the matter. He/she may, but need not appoint another Committee, to review and discuss the matter. He/she shall render his/her decision in writing within a reasonable time, but not later than [30] days after receipt of the request for appeal."

¶ 16　　　　On October 1, 2020, the Associate Dean issued a written decision in plaintiff's case, which showed a committee had been appointed to review the matter. The second-level committee upheld plaintiff's dismissal based solely upon plaintiff's alleged dress code violations, finding that due to "the vastly different recollection of events related to the incident of disruptive behavior during sign-out, [it] felt that it could not effectively determine if [that incident] was grounds for dismissal." The committee determined "the dress code was grounds for dismissal based on the terms of the extension of probation." It believed "there was sufficient documentation that the dress code was well established and understood by all parties."

¶ 17　　　　The third step in the University's appeals process provided for a "Final Appeal" to "the Senior Associate Dean for Academic and Educational Affairs of the College of Medicine" (Senior Associate Dean). The House Staff Manual states as follow:

> "The Resident may appeal the Associate Dean's decision to the Senior Associate

Dean *** within [10] days from the date of issuance of the decision. An appeal to the Senior Associate Dean is permitted only on procedural grounds and a review of the record by the Senior Associate Dean for said appeal shall be limited only to procedural matters. The Senior Associate Dean shall render his/her decision within [10] days after receipt of the request for appeal and such decision shall be final and unappealable."

¶ 18 On October 19, 2020, the Senior Associate Dean issued a written decision, finding the appeal proceedings were "conducted fairly and appropriately" and "sustaining the prior decision to terminate [plaintiff] from the residency program." That decision showed plaintiff raised several procedural challenges to the first- and second-level committee decisions, which the Senior Associate Dean determined were "based upon mistaken information," based upon "misunderstanding of a valid interpretation of the procedures by the committee(s)," or constituted "a non-prejudicial variance from the language of the House Staff [Manual]."

¶ 19 The decision indicates plaintiff initially challenged the "[p]rovision of materials before, during[,] and after the hearings." The Senior Associate Dean noted that the House Staff Manual provided that the parties were " 'permitted to review all materials submitted to the Committee during the hearing' " and that, in plaintiff's case, "[b]oth parties submitted a total of over 350 pages of materials." He also pointed out that plaintiff did not make a request to review any of the submitted documents, but that he was provided with electronic access to the documents prior to the second committee hearing. The Senior Associate Dean also noted that although the House Staff Manual provided that written materials would be appended to the first-level committee's written decision, "attaching over 350 pages of documentation to the report was not practical."

¶ 20　　　　The Senior Associate Dean next addressed a claim by plaintiff pertaining to "[h]earing agendas, witnesses[,] and time allotted each side." He stated the agendas for both hearings allowed each side 30 minutes to present their case; however, plaintiff spent 100 minutes presenting to the first committee and 62 minutes presenting to the second committee, while Dr. Leman spent 61 minutes presenting to the first committee and 36 minutes presenting to the second committee. The Senior Associate Dean also noted that at the second level of the appeal process, the Associate Dean had discretion not only to appoint a committee, but also had "discretion on whether that committee may hear witnesses."

¶ 21　　　　Plaintiff further raised an issue regarding "[e]pisodes of alleged *ex parte* communication." Regarding that claim, the Senior Associate Dean stated as follows:

> "This is not a legal proceeding and thus claims of '*ex parte* communication' and 'close of evidence' have no bearing. Follow up questions or requests for further documentation during a committee's investigation are not prohibited by the [House Staff] Manual. The appellate committee continued their investigation by requesting documentation from both you and the Department regarding the dress code policy in place prior to July 2020. *** The appellate committee considered these responses in their continued deliberations."

¶ 22　　　　The Senior Associate Dean also addressed a claim by plaintiff that pertained to the relevancy of information provided to the committee. He noted that under the House Staff Manual, the committees had the sole right to determine what information, materials, and witnesses were relevant. He stated both committees exercised that discretion in making their determinations.

¶ 23　　　　Finally, the Senior Associate Dean addressed a challenge by plaintiff as to the composition of the first hearing committee on the basis that it was not solely comprised of members

of plaintiff's department. He noted that the committee was constructed so as to avoid faculty members who "participated in prior discussions of [plaintiff's] performance," which led to plaintiff being placed on probation. Given the avoidance of those faculty members and the small size of plaintiff's department, "there were few other available faculty," such that the committee could not be composed entirely of family medicine faculty members.

¶ 24　　　　As stated, in April 2021, plaintiff filed his seven-count complaint against defendants. In connection with his claims against both Dr. Leman and the University—seeking a writ of *certiorari* (count I), alleging breach of contract (count II), and alleging tortious interference with an existing business relationship (count IV)—plaintiff raised allegations that Dr. Leman, acting "in the course and scope of his employment," sought to expel him as a resident from the University "contrary to the established procedures" set forth in the House Staff Manual. He complained no basis for his termination existed based upon a dress code violation, asserting the University failed to produce any specific policy that he had violated and that he had not been "on duty" at the time of the alleged dress code infractions. Plaintiff also alleged that Dr. Leman and the University intentionally and unjustifiably interfered with his business relationship with Methodist by dismissing him from his residency without sufficient cause.

¶ 25　　　　Additionally, plaintiff alleged that there were procedural defects in the University's appeal process. In particular, he asserted that the first hearing committee disregarded its own rules as set forth in the House Staff Manual because (1) only one member of his department served on the three-person committee, (2) it failed to provide him with any written materials that were relied upon during the hearing that showed the written policies upon which his dismissal was based, (3) it considered irrelevant witness testimony, (4) it failed to attach any written materials to its decision, and (5) it permitted Dr. Leman to exceed the 30-minute time limit for the presentation of evidence.

Plaintiff argued the second hearing committee also disregarded its own rules by (1) refusing to hear witness testimony, (2) failing to provide timely access to materials relied upon by Dr. Leman, (3) considering materials submitted by Dr. Leman that were untimely, (4) engaging in *ex parte* communications with Dr. Leman, and (5) failing to attach written materials to its decision.

¶ 26　　　　Plaintiff's claims against only Dr. Leman—for intentional infliction of emotional distress (count VI) and tortious interference with a prospective business relationship (count VII)— were based on allegations that Dr. Leman acted knowingly and recklessly against plaintiff with respect to his dismissal from the residency program, causing plaintiff to suffer severe emotional distress. He also alleged that Dr. Leman unjustifiably interfered with a prospective business relationship he had with a hospital in Georgia. Plaintiff claimed that after Dr. Leman falsely inferred that "grounds relating to [plaintiff's] professionalism" existed in addition to the alleged dress code violations, the Georgia hospital refused to finalize a contract with plaintiff.

¶ 27　　　　Further, in connection with his breach of contract claim against Methodist (count III), plaintiff alleged Methodist's failure to follow the terms of the parties' Residency Agreement. Specifically, he alleged that absent egregious conduct on his part, Methodist was required to provide him with at least four months written notice "if his employment was not being continued or promoted." Plaintiff asserted Methodist breached the parties' agreement because "no such basis for [his] termination existed" and because Methodist terminated his employment without providing him with four months' written notice. With respect to his retaliatory discharge claim against Methodist (count V), plaintiff alleged he was injured on June 4, 2020, "in the course and scope of his employment with [Methodist]" and terminated for exercising his rights under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2020)). He asserted Methodist's purported ground for his termination, *i.e.*, the dress code violations, "was pretextual."

- 12 -

¶ 28        In June 2021, Dr. Leman and the University filed a combined motion to dismiss the counts against them in plaintiff's complaint under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2020)), along with a memorandum of law in support of their motion. Relevant to this appeal, they argued dismissal was appropriate under section 2-619(a)(1) of the Code (*id.* § 2-619(a)(1)) because plaintiff's claims against them were barred by sovereign immunity and, as a result, the trial court lacked jurisdiction. Defendants argued that because the University was an arm of the State and Dr. Leman was at all times acting within the scope and authority of his employment with the University, both were protected by sovereign immunity from plaintiff's claims for damages and other relief "related to completed conduct." Specifically, on the basis of sovereign immunity, they sought dismissal of plaintiff's request for a stay in count I and the dismissal of counts II, III, VI, and VII in their entirety. Also, citing section 2-615 of the Code (*id.* § 2-615), defendants argued dismissal was appropriate because plaintiff failed to allege sufficient facts to support a cause of action for (1) a writ of *certiorari*, (2) intentional infliction of emotional distress, and (3) tortious interference with either an existing or prospective economic relationship.

¶ 29        The same month, Methodist filed a section 2-615 motion to dismiss plaintiff's claims against it for breach of contract and retaliatory discharge. It argued plaintiff failed to state claims upon which relief could be granted because both counts against it were "premised upon the claim that Methodist improperly terminated Plaintiff from his employment," but plaintiff's own allegations and exhibits showed it was the University, rather than Methodist, that terminated plaintiff from his residency program. Methodist maintained that plaintiff's exhibits showed that termination from his employment with Methodist was "automatic" once plaintiff was dismissed from the residency program. It also argued that plaintiff's claim that Methodist was required to

give him four months' notice of his dismissal was "misplaced" as the Residency Agreement only required four months' notice to plaintiff in the event he was not continued or promoted, not in the event that he was terminated.

¶ 30    Further, regarding plaintiff's retaliatory discharge claim, Methodist argued plaintiff fatally failed to plead facts showing that he exercised any rights or remedies available to him under the Workers' Compensation Act. Again, it also asserted that plaintiff's pleading showed it was the University's decision to terminate plaintiff, and "not Methodist's independent employment decision."

¶ 31    In August 2021, plaintiff filed responses to both motions to dismiss. As to the motion filed by Dr. Leman and the University, plaintiff first argued his claims were not barred by sovereign immunity because the "officer suit exception" applied. In particular, plaintiff argued that Dr. Leman had exceeded the scope of his authority in seeking plaintiff's dismissal from the residency program. Plaintiff further responded that he had sufficiently pled causes of action for a writ of *certiorari*, intentional infliction of emotional distress, and tortious interference with either an existing or prospective business relationship. Alternatively, he argued the trial court should grant him leave to amend his pleading to cure any defects.

¶ 32    Plaintiff filed a memorandum of law in support of his response to the University's motion. Attached to his filing was a document entitled "Physician Dress Code"; a document purportedly setting forth Methodist's dress code policy; and a document dated June 19, 2020, which purportedly concerned the extension of plaintiff's probationary period.

¶ 33    Regarding Methodist's motion to dismiss, plaintiff argued the Residency Agreement's four month notice requirement applied to employment terminations absent egregious conduct by a resident. Further, he argued Methodist could not "evade responsibility for its role in

[his] termination by placing the blame solely on [the] University" where the Residency Agreement "specifically adopted and incorporated all of the terms and conditions of the University, including its procedures for termination," into that agreement. Regarding his retaliatory discharge claim, plaintiff argued Methodist could not plausibly claim to have received no notice of his workers' compensation claim prior to his termination in October 2020, because on September 8, 2020, it "entered its appearance and requested access to his medical records." Plaintiff asked the trial court to deny Methodist's motion to dismiss or, alternatively, to grant him leave to amend his pleading to cure any defects.

¶ 34 Following additional briefing by defendants, the trial court conducted a hearing on defendants' motions to dismiss and took the matter under advisement. On September 10, 2021, the court entered a written order, dismissing all counts with prejudice. It found sovereign immunity applied to the counts against Dr. Leman and the University, stating nothing in either the complaint or its exhibits showed Dr. Leman was performing his duties illegally, unconstitutionally, or without authority. Regarding plaintiff's claims against Methodist, the court found that plaintiff's dismissal from the residency program and termination from his employment did not stem from any action taken by Methodist. It stated as follows: "Once [plaintiff] was terminated from the residency program, he could no longer work at Methodist. One follows the other: there must be residency before employment, not the other way around." The court also rejected plaintiff's contention that the Residency Agreement required Methodist to give him four months' notice of the termination from is employment, stating as follows:

> "[Plaintiff] cites section 8 of [the Residency Agreement] to support his claim against Methodist. However that section clearly refers to actions taken by Methodist to either not renew, continue[,] or promote a person in residency training

as in section 8a, or terminate a resident from employment due to certain types of behavior as in section 8f. Section 8 requires one to be a resident. Upon [plaintiff's] dismissal from the residency program supervised by [defendant] Leman for the [University], he was no longer a resident and could not be employed."

¶ 35    In October 2021, plaintiff filed a motion to reconsider the trial court's decision to dismiss all counts of his complaint, arguing the court "misapprehended the application of existing law." Following the filing of responses by defendants and a hearing, the court denied plaintiff's motion.

¶ 36    This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, plaintiff challenges the trial court's dismissal of all seven counts of his complaint. Specifically, he contends (1) the court erred by finding his claims against Dr. Leman and the University were barred by sovereign immunity, (2) no controlling authority exists that writs of *certiorari* are barred by sovereign immunity, and his complaint set forth sufficient facts to support his claim for the issuance of a writ, and (3) he pled sufficient facts to state causes of action for both breach of contract and retaliatory discharge against Methodist. Plaintiff asks this court to reverse the court's dismissal of each count of his complaint, as well as the court's denial of his motion to reconsider.

¶ 39                              A. Motions to Dismiss

¶ 40    A section 2-615 motion to dismiss (735 ILCS 5/2-615 (West 2020)) "challenges the legal sufficiency of a complaint based on certain defects or defenses apparent on the face of the complaint." *Walworth Investments-LG, LLC v. Mu Sigma, Inc.*, 2022 IL 127177, ¶ 39, 215 N.E.3d 843. In ruling on such a motion, a court accepts as true all well-pleaded facts and all

reasonable inferences therefrom and determines "whether the complaint's allegations—construed in the light most favorable to the plaintiff—are sufficient to establish a cause of action upon which relief may be granted." *Id.* "A court should not dismiss a complaint pursuant to [section 2-615] unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." *Rehfield v. Diocese of Joliet*, 2021 IL 125656, ¶ 20, 182 N.E.3d 123.

¶ 41        When ruling on a section 2-615 motion, "[t]he only matters to be considered *** are the allegations of the pleadings themselves." *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 485, 639 N.E.2d 1282, 1289 (1994); see *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 29, 801 N.E.2d 1103, 1109 (2003) ("In ruling on a section 2-615 motion, the court may not consider affidavits, products of discovery, documentary evidence not incorporated into the pleadings as exhibits, or other evidentiary materials."). A document that is attached to a complaint as an exhibit is "considered to be part of the pleading, and facts stated in the exhibit are considered as having been alleged in the complaint." *Tucker v. Soy Capital Bank & Trust Co.*, 2012 IL App (1st) 103303, ¶ 22, 974 N.E.2d 820. "[M]atters contained in such exhibits which conflict with allegations of the complaint negate any contrary allegations of the complaint." (Internal quotation marks omitted.) *Id.* ¶ 23; see *Van Duyn v. Smith*, 173 Ill. App. 3d 523, 538, 527 N.E.2d 1005, 1015 (1988) ("Only well pleaded facts are admitted by a section 2-615 motion to dismiss and it is commonly understood that attached exhibits supercede any inconsistent allegations of a complaint.").

¶ 42        A section 2-619 motion to dismiss (735 ILCS 5/2-619 (West 2020)) "admits the sufficiency of the complaint but asserts a defense outside of the complaint that defeats it." *O'Connell v. County of Cook*, 2022 IL 127527, ¶ 19, 210 N.E.3d 1251. Under section 2-619(a)(1), a complaint may be involuntarily dismissed if the trial court lacks subject matter jurisdiction over the action. 735 ILCS 5/2-619(a)(1) (West 2020). Like a section 2-615 motion, a section 2-619

motion "admits as true all well-pleaded facts and all reasonable inferences from those facts." *Cahokia Unit School District No. 187 v. Pritzker*, 2021 IL 126212, ¶ 24, 184 N.E.3d 233. Under both sections, our review is *de novo*. *Id.*

¶ 43                    B. Plaintiff's Claims Against Dr. Leman and the University

¶ 44                            1. *Sovereign Immunity*

¶ 45          Initially, plaintiff contends the trial court erred in finding his claims against Dr. Leman and the University were barred by sovereign immunity. Specifically, he argues that the officer suit exception to the sovereign immunity doctrine applies because Dr. Leman acted in excess of his authority to terminate plaintiff for dress code violations by creating "a different policy to suit his own needs rather than constraining his actions to the scope of his authority."

¶ 46          The University and Dr. Leman respond by arguing that the trial court properly dismissed plaintiff's breach of contract and tort claims against them (counts II, IV, VI, and VII) on the basis of sovereign immunity. They maintain that the officer suit exception is inapplicable and that the case authority relied upon by plaintiff is distinguishable from the present case. For the reasons that follow, we agree with defendants.

¶ 47          "The Illinois Constitution of 1970 abolished the doctrine of sovereign immunity '[e]xcept as the General Assembly may provide by law.' " *PHL, Inc. v. Pullman Bank & Trust Co.*, 216 Ill. 2d 250, 259-60, 836 N.E.2d 351, 356 (2005) (quoting Ill. Const. 1970, art. XIII, § 4). "Pursuant to its constitutional authority, the General Assembly reestablished sovereign immunity in the State Lawsuit Immunity Act." *Id.* at 260 (citing 745 ILCS 5/0.01 *et seq.* (West 1998)). Section 1 of the State Lawsuit Immunity Act states as follows:

> "Except as provided in the Illinois Public Labor Relations Act, the Court of Claims Act, the State Officials and Employees Ethics Act, and Section 1.5 of this Act, the

State of Illinois shall not be made a defendant or party in any court." 745 ILCS 5/1 (West 2020).

The Court of Claims Act provides that the court of claims has "exclusive jurisdiction to hear and determine" various matters, including claims against the State that are founded upon any contract entered into with the State and claims for damages in cases sounding in tort. 705 ILCS 505/8 (West 2020).

¶ 48    "[O]ur public universities are considered 'the State' for the purposes of the [State Lawsuit] Immunity Act and Court of Claims Act." *Carmody v. Thompson*, 2012 IL App (4th) 120202, ¶ 20, 977 N.E.2d 887. Additionally, "[a] suit against a State official in his or her official capacity is a suit against the official's office and is therefore no different than a suit against the State." *Parmar v. Madigan*, 2018 IL 122265, ¶ 21, 106 N.E.3d 1004; see *Leetaru v. Board of Trustees of the University of Illinois*, 2015 IL 117485, ¶ 44, 32 N.E.3d 583 ("That an action is nominally one against the servants or agents of the State does not mean that it will not be considered as one against the State itself.").

¶ 49    Ultimately, the determination of whether an action is one against the State does not depend on the formal identification of the parties but "upon the issues involved and the relief sought." *Parmar*, 2018 IL 122265, ¶ 22. An action against a State employee may be considered as one against the State when (1) there are no allegations that a State agent or employe acted beyond the scope of his authority through wrongful acts, (2) the duty alleged to have been breached was not owed to the public generally independent of State employment, and (3) the complained-of actions involve matters ordinarily within the employee's normal and official functions of the State. *Carmody*, 2012 IL App (4th) 120202, ¶ 22 (citing *Healy v. Vaupel*, 133 Ill. 2d 295, 309, 549 N.E.2d 1240, 1247 (1990)).

¶ 50 Consistent with the above authorities, a notable exception to sovereign immunity is the officer suit exception, which our supreme court has described as follows:

> "Where *** a plaintiff alleges that the State officer's conduct violates statutory or constitutional law or is in excess of his or her authority, such conduct is not regarded as the conduct of the State. The underlying principle is that conduct taken by a State officer without legal authority strips the officer of his or her official status. [Citation.] Thus, a complaint seeking to prospectively enjoin such unlawful conduct may be brought in the circuit court without offending sovereign immunity principles. [Citations]." *Parmar*, 2018 IL 122265, ¶ 22.

¶ 51 Significantly, however, "not every legal wrong committed by an officer of the State will trigger [the officer suit] exception." *Leetaru*, 2015 IL 117485, ¶ 47. The exception will not apply (1) "where the challenged conduct amounts to simple breach of contract and nothing more" or (2) when the state official merely "has exercised the authority delegated to him or her erroneously." *Id.* Instead, the exception is aimed "at situations where the official is not doing the business which the sovereign has empowered him or her to do or is doing it in a way which the law forbids." *Id.*

¶ 52 Here, in finding plaintiff's claims against Dr. Leman and the University were barred by sovereign immunity, the trial court relied on this court's decision in *Wozniak v. Conry*, 288 Ill. App. 3d 129, 679 N.E.2d 1255 (1997), which it found presented similar circumstances. In *Wozniak*, the plaintiff was an associate professor at the University of Illinois. *Id.* at 130. Following a reassignment that removed him from his teaching position, the plaintiff brought a cause of action against the defendant, who was the head of his department, alleging tortious interference with his employment contract. *Id.* Specifically, the plaintiff alleged the defendant "made false accusations

about him, knowing they were untrue or acting with reckless disregard for their truth." *Id.* 130-31. The trial court dismissed the plaintiff's complaint on the defendant's motion, accepting the defendant's argument that plaintiff's action was one against the State that could only be brought in the court of claims. *Id.* at 131.

¶ 53        On review, we agreed that the plaintiff's claim was barred by sovereign immunity *Id.* at 135. In so holding, we "recognized that a suit against a state employee in his individual capacity constitutes a claim against the state when a judgment for the plaintiff could control the state's actions or subject it to liability." *Id.* at 133 (citing *Currie v. Lao*, 148 Ill. 2d 151, 158, 592 N.E.2d 977, 980 (1992)). We stated as follows:

> "[W]hen a supervisor for a state department or entity is sued by an employee for statements regarding the employee's work-related conduct and pending personnel decisions, the suit necessarily threatens to control the actions of the state. It does not matter if, as here, the plaintiff alleges the statements were knowingly false. [Citation.] Instead, the relevant inquiry is whether the supervisor would be acting within the scope of his duties by making truthful statements of the general type alleged." *Id.* at 133-34.

¶ 54        We further stated that the rule "that a suit against a state employee constitutes a suit against the state when a judgment for a plaintiff could control the state's actions" was not without limits. *Id.* at 134. Referencing the officer suit exception, we pointed out that "[w]henever a state employee performs illegally, unconstitutionally, or without authority, a suit may still be maintained against the employee in his individual capacity and does not constitute an action against the State of Illinois." *Id.* Regarding the case at issue, we stated as follows:

> "To allow [the plaintiff's] suit against [the defendant] in his individual capacity

clearly would limit [the defendant's] ability to engage in lawful activity on behalf of the University—namely, to communicate, allocate tasks, and make personnel and other employment decisions. [The defendant's] comments, *which were within the scope of his employment*, related to the employment relationship between [the plaintiff] and the University. One comment concerned the Dean's response to [the plaintiff's] alleged misconduct. The rest of [the defendant's] comments involved [the plaintiff's] performance as a teacher and supervisor. A judgment for [the plaintiff] would directly influence [the defendant's] ability as a state employee to handle departmental personnel issues. Accordingly, this suit threatens to control the actions of the state." (Emphasis added.) *Id.*

¶ 55    In this case, like in *Wozniak*, plaintiff's claims against Dr. Leman and the University amount to claims against the State. Plaintiff's allegations regarding Dr. Leman concern actions taken within the scope of his authority as the program director of plaintiff's residency program. As the program director, Dr. Leman was empowered to supervise, evaluate, and discipline the residents in his program. In particular, lapses in professionalism by a resident, including dress code violations, were subject to action by Dr. Leman as plaintiff's program director. Permissible disciplinary actions included placing a resident on probation and dismissal from the residency program. Further, grounds for dismissal included a resident's failure to meet or advance in any of the required competencies, including professionalism. All of Dr. Leman's alleged actions in the present case related to plaintiff's enrollment in the residency program, over which Dr. Leman had supervisory authority.

¶ 56    As noted, plaintiff contends Dr. Leman acted without authority by creating "a different [dress code] policy to suit his own needs rather than constraining his actions to the scope

of his authority." However, the allegations of his complaint consistently describe Dr. Leman as acting "in the course and scope of his employment." Additionally, in his complaint, plaintiff alleged only that Dr. Leman sought to expel him "contrary to established procedures" and that there was no basis for his dismissal from the residency program. Such allegations do not reflect that Dr. Leman was acting outside of or contrary to his authority as program director. Rather, at most, they show an erroneous exercise of delegated authority. Notably, plaintiff does not raise any contention that Dr. Leman breached a duty owed to the general public independent of his State employment or that the complained of actions involved matters not ordinarily within Dr. Leman's normal and official functions.

¶ 57          Additionally, the cases plaintiff relies upon are distinguishable. First, plaintiff cites *Fritz v. Johnston*, 209 Ill. 2d 302, 807 N.E.2d 461 (2004), arguing that in that case, the "supreme court acknowledged the limits of *Wozniak*'s applicability in an instance where two supervisors attempted to get an employee to quit or face a police investigation as that act of conspiracy could not reasonably be viewed as an action by the state." However, in *Fritz*, the supreme court simply distinguished *Wozniak* from the facts before it, stating as follows:

> "*Wozniak* involved a state employee in a supervisory role who merely made 'work-related statements' within the context of that supervisory role. The instant case, by contrast, involves allegedly false reports to an independent agency—the State Police—in direct violation of criminal law." *Id.* at 313.

The present case does not involve allegations that Dr. Leman violated a criminal statute and is, thus, more similar to the facts presented in *Wozniak* than in *Fritz*.

¶ 58          Plaintiff also relies on the supreme court's decision in *Leetaru*. There, the plaintiff, who was a graduate student and former employee of the University of Illinois, brought an action

to enjoin the University and one of its vice chancellors from taking further action in an investigation against him. *Leetaru*, 2015 IL 117485, ¶ 1. Ultimately, the supreme court rejected an argument by the defendants that the plaintiff's claim was barred by sovereign immunity. *Id.* ¶ 49. In so holding, the court stated it had "repeatedly reaffirmed the right of plaintiffs to seek *injunctive relief* in circuit court to prevent unauthorized or unconstitutional conduct by the State, its agencies, boards, departments, commissions and agents or to compel their compliance with legal or constitutional requirements." (Emphasis added.) *Id.* ¶ 48.

¶ 59            Regarding the case before it, the supreme court pointed out that the plaintiff alleged acts and omissions by the defendants that involved "far more than a mere difference of opinion over how the rules and regulations should be interpreted or applied and are not simply the result of some inadvertent oversight or *de minimis* technical violation." *Id.* ¶ 49. Instead, they constituted "a fundamental disregard for core provisions governing academic discipline at the University, thereby exceeding defendants' authority and violating [the plaintiff's] constitutional rights to due process." *Id.* The court also found it significant that the plaintiff's action did not "seek redress for some past wrong," such as damages, but "only to prohibit future conduct (proceeding with the disciplinary process) undertaken by agents of the State in violation of statutory or constitutional law or in excess of their authority." *Id.* ¶ 51. It stated such claims were "not against the State at all and do not threaten the State's sovereign immunity." *Id.*

¶ 60            The circumstances in *Leetaru* differ from those in the present case. First, unlike in *Leetaru*, plaintiff's allegations in this case *do* reflect "a mere difference of opinion over how the rules and regulations should be interpreted or applied." *Id.* ¶ 49. At the heart of plaintiff's challenge is a dispute over whether plaintiff's conduct violated defendants' dress code and warranted his dismissal from the residency program. Second, unlike the plaintiff in *Leetaru*, plaintiff in this case

did not seek to prohibit future conduct in connection with his breach of contract and tort claims. Rather, he sought redress for a past wrong, his dismissal from the residency program, asking the trial court to order his full reinstatement and award monetary damages. Such claims do threaten the State's sovereign immunity. See *Parmar*, 2018 IL 122265, ¶ 26 ("*Leetaru* makes plain that a complaint seeking damages for a past wrong does not fall within the officer suit exception to sovereign immunity.").

¶ 61        Under the circumstances presented, plaintiff has failed to establish that the officer suit exception to the sovereign immunity doctrine applies to his claims. Accordingly, we find the trial court committed no error in dismissing plaintiff's breach of contract and tort claims against Dr. Leman and the University—as set forth in counts II, IV, VI, and VII of plaintiff's complaint—based on a lack of subject matter jurisdiction. For the same reasons, plaintiff is not entitled to reversal of the court's denial of his motion to reconsider.

¶ 62                                  2. *Writ of Certiorari*

¶ 63        As stated, plaintiff separately challenges the trial court's dismissal of count I of his complaint, in which he raised a claim for a common law writ of *certiorari* against Dr. Leman and the University. He contends such a claim is not barred by sovereign immunity and that his complaint set forth sufficient facts to support his claim for the issuance of the writ.

¶ 64        Initially, defendants agree with plaintiff that sovereign immunity does not bar his claim. See *Applegate v. State of Illinois Department of Transportation*, 335 Ill. App. 3d 1056, 1061, 783 N.E.2d 96, 101 (2002) ("Sovereign immunity does not bar a party from seeking judicial review of an agency's action by common-law writ of *certiorari*."); see also *Dusthimer v. Board of Trustees of the University of Illinois*, 368 Ill. App. 3d 159, 164, 857 N.E.2d 343, 349 (2006) (stating quasi-judicial decisions of the University of Illinois are "reviewable in an action for a writ of

*certiorari*"). However, they contend that dismissal is appropriate under section 2-615 of the Code because plaintiff failed to state a cause of action for a common law writ of *certiorari*.

¶ 65 We note that in their combined motion to dismiss plaintiff's claims against them and accompanying memorandum of law, defendants sought the dismissal of count I under section 2-615 of the Code, asserting plaintiff failed to allege sufficient facts to support a cause of action for a writ of *certiorari*. Nevertheless, in its written order, the trial court indicated it was dismissing plaintiff's *certiorari* claim under section 2-619 of the Code on the basis of sovereign immunity. As defendants point out, the court subsequently commented at the hearing on plaintiff's motion to reconsider that it relied on "the briefing done by the Defendants" in finding that plaintiff's *certiorari* argument failed. However, no matter the rationale relied upon by the trial court, this court may affirm the dismissal of plaintiff's claim on any grounds supported by the record. See *Carroll v. Community Health Care Clinic, Inc.*, 2017 IL App (4th) 150847, ¶ 18, 81 N.E.3d 122 ("[T]his court may affirm the circuit court's granting of a motion to dismiss on any basis or ground established by the record, regardless of the circuit court's reasoning."). Accordingly, on review, we consider whether plaintiff's complaint alleged sufficient facts to state a common law claim for a writ of *certiorari*.

¶ 66 "The common law writ of *certiorari* was developed to provide a means whereby a petitioner who was without avenue of appeal or direct review could obtain limited review over action by a court or other tribunal exercising quasi-judicial functions." *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 427, 551 N.E.2d 640, 645 (1990). The purpose of a writ is "to have the entire record of the inferior tribunal brought before the court to determine, from the record alone, whether that body proceeded according to the applicable law." *Id.* "Quasi-judicial proceedings are designed to adjudicate disputed facts in a particular case," and

"[q]uasi-judicial hearings concern agency decisions that affect a small number of persons on individual grounds based on a particular set of disputed facts that have been adjudicated." *East St. Louis School District No. 189 Board of Education v. East St. Louis School District No. 189 Financial Oversight Panel*, 349 Ill. App. 3d 445, 449, 811 N.E.2d 692, 697 (2004).

¶ 67 "Writs of *certiorari* may be issued by a trial court to inferior tribunals whenever it can be shown that they have either exceeded their jurisdiction or have proceeded illegally and no direct appeal or other method of direct review of their proceedings is provided." (Internal quotation marks omitted.) *City of Kankakee v. Department of Revenue*, 2013 IL App (3d) 120599, ¶ 14, 988 N.E.2d 723. A tribunal proceeds illegally where it fails to "follow the essential procedural requirements applicable to such cases." *C & K Distributors, Inc. v. Hynes*, 122 Ill. App. 3d 525, 528, 461 N.E.2d 560, 562 (1984). "The writ should not issue *** in the absence of substantial injury or injustice to the petitioner." *Stratton*, 133 Ill. 2d at 428.

¶ 68 Additionally, "[t]he standards of review under a common law writ of *certiorari* are essentially the same as those under the Administrative Review Law." *Hanrahan v. Williams*, 174 Ill. 2d 268, 272, 673 N.E.2d 251, 253-54 (1996). "Under the Administrative Review Law, courts generally do not interfere with an agency's discretionary authority unless the exercise of that discretion is arbitrary and capricious [citation] or the agency action is against the manifest weight of the evidence [citation]." *Id.* at 272-73; see *Torres v. Kane County, Public Aid Committee*, 130 Ill. App. 3d 296, 298, 474 N.E.2d 45, 46 (1985) ("[C]ommon law *certiorari* is available to review the determination of an administrative agency on the ground that the agency's finding was against the manifest weight of the evidence where review under the Administrative Review Act is not provided").

¶ 69 Initially, to the extent plaintiff brings his claim for a writ of *certiorari* against Dr.

Leman, his claim must fail. In particular, plaintiff has failed to allege any facts showing that Dr. Leman exercised judicial or quasi-judicial functions. See *Rochon v. Rodriguez*, 293 Ill. App. 3d 952, 956, 689 N.E.2d 288, 291 (1997) (finding a police "superintendent's decisions to discipline [police officers] were not judicial or quasi-judicial acts"). Rather than adjudicate a particular set of disputed facts, Dr. Leman, as plaintiff's program director, made disciplinary decisions that resulted in plaintiff's termination from his residency program. Accordingly, plaintiff cannot state a cause of action against Dr. Leman for a writ of *certiorari*.

¶ 70    Regarding the University, plaintiff argues he alleged sufficient facts in his complaint to show that the University exercised quasi-judicial functions through its three-level appeals process. Additionally, he contends the University "failed to comply with the law" and "exceeded [its] authority" by failing to follow the policies and procedures set forth in the House Staff Manual. Plaintiff argues the allegations of his complaint showed he was dismissed based on dress code violations for "actions which did not violate the dress code," *i.e.*, failing "to wear an overcoat while off duty." Plaintiff maintains such conduct by the University was "arbitrary and capricious." He also argues that the University violated various procedural requirements for its three-level appeals process. He contends such procedural violations denied him a fair hearing and due process.

¶ 71    We note that in presenting his arguments on appeal, plaintiff references a "Physician's Dress Code," which was attached to his response to defendants' motion to dismiss but not as an exhibit to his complaint. As noted, when a section 2-615 motion to dismiss is at issue, "[t]he only matters to be considered *** are the allegations of the pleadings themselves." *Illinois Graphics Co.* 159 Ill. 2d at 485; see *Cwikla*, 345 Ill. App. 3d at 29 ("In ruling on a section 2-615 motion, the court may not consider affidavits, products of discovery, documentary evidence not

incorporated into the pleadings as exhibits, or other evidentiary materials."). On review, we consider only plaintiff's complaint and its attached exhibits to determine whether he properly stated a cause of action for a writ of *certiorari*. Additionally, while the error does not impede our review, we note plaintiff has also consistently and improperly cited to the appendix of his appellant's brief rather than to relevant portions of the appellate record in violation of the Illinois Supreme Court Rules. See Ill. S. Ct. Rule 341(h)(7) (eff. Oct. 1, 2020) (stating the argument section of an appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. Evidence shall not be copied at length, but reference shall be made to the pages of the record on appeal where evidence may be found").

¶ 72          First, regarding the factual basis of his dismissal, plaintiff asserted in his complaint that he was alleged to have violated the dress code by "failing to wear a pullover or scrub coat over a short sleeved Under Armor t-shirt while [he] was present in the resident lounge as well as when following up with a patient while on a lunch break." Plaintiff's notice of dismissal, attached to his complaint as an exhibit, stated plaintiff's dress code violation stemmed from him walking into a patient room "wearing scrubs and a short-sleeved UA T-shirt, with no lab coat or pullover." Although plaintiff persistently maintains on appeal that the alleged dress code violation occurred while he was off duty, the factual allegations of his complaint reflect otherwise, showing the violation occurred while plaintiff was seeing a patient and, thus, acting in his professional capacity. They also show that the alleged violation occurred during a period when plaintiff was already on probation in his residency program and subject to dismissal for any dress code violation. Ultimately, the facts pleaded by plaintiff reflect neither a violation by the University of any policy or procedure relating to its dress code, nor any arbitrary and capricious conduct.

¶ 73 Second, as noted, plaintiff claims the University violated its own procedures during its three-level appeals process. Although plaintiff sets forth the alleged procedural violations in his complaint, he alleged no facts showing that the University failed to follow any "essential procedural requirements" (*C & K Distributors*, 122 Ill. App. 3d at 528) or that he suffered any "substantial injury or injustice" (*Stratton*, 133 Ill. 2d at 428) as a result. Moreover, none of plaintiff's factual allegations were sufficient to show that the alleged procedural defects in the University's appeals process violated his due process rights. "Due process entails an orderly proceeding wherein a person is served with notice, actual or constructive, and has an opportunity to be heard and to enforce and protect his rights." *Stratton*, 133 Ill. 2d at 432. In this instance, plaintiff failed to allege any facts showing a lack of notice or an opportunity to be heard. Rather, the exhibits to his complaint reflect plaintiff received notice and an opportunity to be heard at every stage of the appeals process and that even his alleged procedural violations were raised and considered during the final stage of that process.

¶ 74 Under the circumstances presented, we find plaintiff's complaint failed to allege sufficient facts to state a cause of action for a writ of *certiorari*. Thus, dismissal of count I was appropriate under section 2-615 of the Code. For the same reasons, plaintiff has failed to show the trial court erred by denying his motion to reconsider.

¶ 75                                    3. *Leave to Amend*

¶ 76 In his reply brief, plaintiff argues that he should have the opportunity to file an amended complaint in the event this court finds the dismissal of count I was appropriate under section 2-615 of the Code. He (1) notes that he requested leave to amend as alternative relief in his response to defendants' motion to dismiss, (2) argues he had no previous opportunities to amend his pleading, and (3) asserts defendants would not be prejudiced by the filing of an amended

complaint. However, because plaintiff raised this claim for the first time in his reply brief, it has been forfeited. See Ill. S. Ct. Rule 341(h)(7) (eff. Oct. 1, 2020) (stating points not argued in an appellant's brief "are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); see also *Galvan v. Northwestern Memorial Hospital*, 382 Ill. App. 3d 259, 262 n.1, 888 N.E.2d 529, 534 n.1 (2008) (finding no need to address the plaintiff's contention that they should have been granted leave to amend their complaint where it was raised for the first time on appeal in the plaintiff's reply brief).

¶ 77        Additionally, even if we were to set aside plaintiff's forfeiture based on his failure to raise his request for leave to amend in his appellant's brief, we note he has offered no argument regarding how he could amend his complaint to properly state a cause of action. See *Hadley v. Ryan*, 345 Ill. App. 3d 297, 303, 803 N.E.2d 48, 54 (2003) (stating one factor that should be considered when determining whether to allow an amendment is "whether the amendment would cure a defect in the pleadings"). Moreover, although plaintiff generally requested leave to amend with the trial court in his written response to defendants' motion to dismiss, he never pursued that request with the court—including in his motion to reconsider the court's dismissal of his complaint—nor did he ever submit any proposed amendment to the court. See *Firebirds International, LLC v. Zurich American Insurance Co.*, 2022 IL App (1st) 210558, ¶ 43, 208 N.E.3d 1187 ("[F]ailure to tender the proposed amendment forfeits the party's right to review of the trial court's denial of a request for leave to amend."); *Sellers v. Rudert*, 395 Ill. App. 3d 1041, 1055, 918 N.E.2d 586, 598 (2009) (same). Thus, under the circumstances, we find the issue forfeited and decline to consider it.

¶ 78                    C. Plaintiff's Claims Against Methodist

¶ 79                         1. *Breach of Contract*

- 31 -

¶ 80 Regarding his claims against Methodist, plaintiff first argues he pled sufficient facts to state a cause of action for breach of contract. In particular, he contends the trial court erred by finding the Residency Agreement did not require Methodist to provide him with four months' written notice before it terminated his employment. Methodist responds, arguing the exhibits to plaintiff's complaint negate (1) any allegation that Methodist terminated plaintiff's employment and (2) the allegation Methodist was required to provide plaintiff with four months' written notice. We agree with Methodist.

¶ 81 "To succeed on a breach of contract claim, a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903, ¶ 28, 215 N.E.3d 871. Additionally, Illinois is a fact-pleading jurisdiction, which requires "that the plaintiff allege facts sufficient to bring a claim within a legally recognized cause of action." *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 26, 965 N.E.2d 1092. As noted, "matters contained in *** [attached] exhibits which conflict with allegations of the complaint negate any contrary allegations of the complaint." (Internal quotation marks omitted.) *Tucker*, 2012 IL App (1st) 103303, ¶ 23.

¶ 82 Here, in his complaint, plaintiff alleged Methodist breached the Residency Agreement "by terminating [his] employment." However, he alleged no facts showing any employment action taken against him by Methodist. Instead, as argued by Methodist, the exhibits to plaintiff's complaint show only that it was the University and Dr. Leman that dismissed plaintiff from the residency program. Specifically, as an exhibit to his complaint, plaintiff attached the "Formal Notice of Dismissal" he received in July 2020 from Dr. Leman, as program director for the University's family medicine residency program, which informed him that he was "being

dismissed from the family medicine residency effective immediately." He also attached the written decisions he received following each level of the University's appeals process, which each upheld that dismissal.

¶ 83    Additionally, plaintiff alleged in his complaint that both he and Methodist "agreed to be bound by the terms and conditions" of the Residency Agreement he attached to his complaint, and he cites specific provisions of that agreement to support his contention that Methodist was required to give him four months' notice of any termination. We note, however, that the Residency Agreement itself states that it covers only the time period from July 1, 2018, to June 30, 2019 ("Unless terminated earlier ***, the term of this Agreement, and accordingly, the employment and appointment created by this Agreement, shall commence July l, 2018 and end June 30, 2019[.]"). It further provides that Methodist may offer a resident "re-employment and reappointment" and, in the event that it does so, the resident and Methodist "shall enter into a new agreement that will govern the terms and conditions of such re-employment and reappointment." Accordingly, the Residency Agreement that plaintiff attached to his complaint did not govern his employment with Methodist during the relevant time frame in 2020, when plaintiff was dismissed from the residency program. Thus, it negates the allegations of plaintiff's complaint, *i.e.*, that its provisions controlled the parties' employment relationship.

¶ 84    Given these circumstances, the record reflects plaintiff failed to plead sufficient facts to state a cause of action for breach of contract against Methodist. Thus, the trial court properly dismissed that claim under section 2-615 of the Code and committed no error in denying plaintiff's motion to reconsider that dismissal.

¶ 85                              2. *Retaliatory Discharge*

¶ 86    Finally, plaintiff also argues the allegations of his complaint were sufficient to state

- 33 -

a cause of action or retaliatory discharge. We disagree.

¶ 87　　　　"In Illinois, in order to establish a tort claim for retaliatory discharge, a plaintiff must show (1) that she has been discharged; (2) in retaliation for her activities; and (3) that the discharge violates a clear mandate of public policy." (Internal quotation marks omitted). *Rehfield*, 2021 IL 125656, ¶ 27.

¶ 88　　　　Here, to support his retaliatory discharge claim, plaintiff alleged in his complaint that (1) he was employed by Methodist, (2) he was injured in the course and scope of his employment on June 4, 2020, (3) he was discharged by Methodist on October 19, 2020, purportedly because he violated its dress code policy, and (4) the reason for his termination was pretextual because Methodist "had not taken similar action against other employees who had violated the dress code who did not exercise their respective rights under the Workers' Compensation Act." Plaintiff alleged Methodist terminated his employment "due to his exercise of his rights or remedies granted to him by the Workers' Compensation Act and at common law."

¶ 89　　　　Initially, as set forth above, plaintiff failed to allege sufficient facts showing any specific adverse employment actions taken by Methodist against him. Further, the exhibits to his complaint show only actions by Dr. Leman and the University to discharge him from his residency program.

¶ 90　　　　Additionally, as Methodist points out, plaintiff failed to plead any facts showing that (1) he exercised his rights under the Workers' Compensation Act or common law with respect to his alleged work-related injury or (2) that Methodist had knowledge of either plaintiff's alleged injury or any resulting exercise of his rights. On appeal, plaintiff asserts "Methodist cannot plausibly claim to have no notice of [his] workers' compensation claim prior to [his] termination *** on October 19, 2020" because "Methodist, through counsel[,] had entered its appearance and

- 34 -

requested access to his medical records on September 8, 2020." Ultimately, however plaintiff failed to plead any such facts in his complaint, resulting in his failure to state a cause of action. Given these circumstances, plaintiff has filed to show the trial court erred either in its dismissal of his retaliatory discharge claim or by denying his motion to reconsider that dismissal.

¶ 91                                3. *Leave to Amend*

¶ 92          In his reply brief, plaintiff, again, suggests he should be permitted to amend his complaint to cure any defects. However, as before, we find this argument forfeited and decline to consider it. See Ill. S. Ct. Rule 341(h)(7) (eff. Oct. 1, 2020) (stating points not argued in an appellant's brief "are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); see also *Galvan*, 382 Ill. App. 3d at 263 n.1 (finding no need to address the plaintiff's contention that they should have been granted leave to amend their complaint where it was raised for the first time on appeal in the plaintiff's reply brief). Not only does plaintiff raise his contention for the first time on appeal in his reply brief, he also failed to properly pursue a request for leave to amend his complaint with the trial court. See *Firebirds International*, 2022 IL App (1st) 210558, ¶ 43 ("[F]ailure to tender the proposed amendment forfeits the party's right to review of the trial court's denial of a request for leave to amend."); *Sellers*, 395 Ill. App. 3d at 1055 (same).

¶ 93                                III. CONCLUSION

¶ 94          For the reasons stated, we affirm the trial court's judgment.

¶ 95          Affirmed.