NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240634-U

NO. 4-24-0634

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 4, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| STEVE MAXSON, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | McLean County |
| THE CITY OF CHENOA, an Illinois Municipal | ) | No. 18MR140 |
| Corporation, and CHRIS WILDER, Mayor of the City of | ) | |
| Chenoa, | ) | |
|     Defendants | ) | Honorable |
| (The City of Chenoa, an Illinois Municipal Corporation, | ) | Rebecca S. Foley, |
| Defendant-Appellee). | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Justices Doherty and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court properly granted summary judgment in the employer defendant's favor where the employee plaintiff failed to present evidence establishing the causation element of his claims for violation of the Illinois Whistleblower Act (740 ILCS 174/1 through 40 (West 2018)) and common-law retaliatory discharge.

¶ 2    Plaintiff, Steve Maxson, brought an action against defendant, the City of Chenoa, an Illinois Municipal Corporation (City), alleging retaliatory discharge in violation of the Illinois Whistleblower Act (740 ILCS 174/1 through 40 (West 2018)) and common-law retaliatory discharge. The trial court granted summary judgment in the City's favor and plaintiff appeals. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    The City is a non-home rule municipality that at all times relevant to this appeal

operated under a commission form of government. Its governing city council consisted of a mayor and four commissioners. In April 2016, the city council voted to hire plaintiff to serve as the superintendent of the City's Waterworks and Sewerage Department. Plaintiff's job duties included overseeing the day-to-day operations of the City's water system, ensuring the water system was functioning properly, and overseeing work crews. Plaintiff reported directly to Commissioner Donald Schultheis, the supervising commissioner for his department.

¶ 5 On January 8, 2018, the city council—then consisting of Mayor Chris Wilder and Commissioners Kyle Buchanan, Dwayne Price, John Strike, and Schultheis—terminated plaintiff's employment with the City by a vote of 4 to 1. The votes were cast following a closed executive session, during which the city council discussed plaintiff's job performance in connection with a water main break on Grant Street. Wilder stated plaintiff had been informed of the break "in the summer," but, after initially investigating and flagging the area, he "ignored the situation." Ultimately, Price made a motion to terminate plaintiff's employment with the City, which was seconded by Buchanan. Only Schultheis voted against plaintiff's termination and voiced his opposition to such an action during the city council's closed executive session.

¶ 6 Plaintiff appealed his termination and was given the opportunity to have a hearing before the city council to state his position and call witnesses on his behalf. Following that hearing on January 22, 2018, the city council upheld plaintiff's termination by a vote of 4 to 1. Again, only Schultheis voted against termination.

¶ 7 In March 2018, plaintiff filed his original two-count complaint, naming as defendants the City, Wilder, and all four commissioners. He sought review of the underlying termination proceedings, raising a claim for a common-law writ of *certiorari* (count I) or, alternatively, administrative review under the Illinois Administrative Review Law (735 ILCS

5/3-101 through 3-113 (West 2018)) (count II). After filing the administrative record with the trial court, defendants moved to dismiss plaintiff's complaint. Plaintiff was granted leave to amend and, in July 2019, filed the five-count second amended complaint that is at issue on appeal.

¶ 8        In his second amended complaint, plaintiff named only the City and Wilder as defendants. He raised claims that alleged violations of the Whistleblower Act and retaliatory discharge against both the City (counts I and II) and Wilder (counts III and IV), as well as a claim for a common-law writ of *certiorari* against the City (count V). Plaintiff asserted that, while employed by the City, he became aware of certain "unethical and/or illegal acts committed by Wilder in his capacity as Mayor," which involved Wilder's use of public funds and resources to further Wilder's personal and political interests. He identified the following specific acts:

"a.        Between April 7, 2016[,] and January 8, 2018, Wilder directed personnel at the City *** to purchase cold patch asphalt for use in the Chenoa Family Restaurant's parking lot. The Chenoa Family Restaurant was not required to reimburse the City *** per City Ordinance and/or other applicable rules.

b.        Between April 7, 2016[,] and January 8, 2018, Wilder directed personnel at the City *** to patch the Chenoa Family Restaurant's parking lot. The Chenoa Family Restaurant was not required to pay the City *** for this work per City Ordinance and/or other applicable rules. However, the Chenoa Family Restaurant paid for Wilder to take a vacation to Las Vegas.

c.        Between April 7, 2016[,] and January 8, 2018, Wilder gave away water meters to political supporters. However, pursuant to City Ordinance and/or other applicable rules, residents are required to purchase water meters.

d.        Between April 7, 2016[,] and January 8, 2018, Wilder directed personnel at

the City *** to cut down two (2) trees for a political supporter, at no cost, on City time and with City equipment.

e. Between April 7, 2016[,] and January 8, 2018, Wilder directed personnel at the City *** to repair the roof and wall of a woodworking shop owned by a political supporter, at no cost, on City time and with City equipment."

¶ 9 According to plaintiff, he reported Wilder's unethical and/or illegal acts to Schultheis and "outside counsel" for the City. In retaliation for his disclosures, he was terminated. Plaintiff alleged the City did not follow its own "progressive discipline policy" leading up to his termination and that the stated rationale for his termination—his failure to timely address the Grant Street water main break—was pretextual. He further alleged that he was denied basic due process when appealing his termination with the City.

¶ 10 In August 2019, the City and Wilder filed a motion to dismiss all five counts of plaintiff's second amended complaint pursuant to section 2-619(a)(9) of the Code of Civil Procedure (*id.* § 2-619(a)(9)). In January 2020, the trial court granted the motion with prejudice with respect to count V, raising a claim for a common-law writ of *certiorari*, but denied the motion as to counts I through IV, alleging violations of the Whistleblower Act and common-law retaliatory discharge.

¶ 11 In August 2023, the City and Wilder filed a motion for summary judgment on all remaining counts of plaintiff's second amended complaint. They also later filed a supplemental motion. The City and Wilder argued plaintiff was an at-will employee, not entitled to "progressive discipline" procedures, and validly terminated from his employment. The City and Wilder asked the trial court to take judicial notice of the administrative record filed in the case and asserted that it readily supported a finding of cause for plaintiff's termination and contained no evidence of

retaliation. They argued plaintiff had to establish a causal relationship between his activities and his termination but that he could not do so because the City had a valid, nonpretextual basis for discharging him. The City and Wilder also argued that plaintiff's "vague, unspecific claim that [Wilder] 'used public funds and resources to further his personal and political interests' [was] insufficient to render 'pretextual,' the valid reasons for his termination." They asserted plaintiff failed to identify a statute, regulation, or other specific provision that Wilder allegedly violated. Additionally, they argued that evidence in the case established only that plaintiff discussed his concerns about Wilder with Schultheis and that no evidence supported a finding that his allegations of unethical or illegal conduct were brought to the attention of Wilder or the other commissioners. In support of their motion, the City and Wilder relied on the City's employee manual and employee discipline and termination policy; the affidavit of Steven Mann, the City's municipal counsel; and the depositions of plaintiff, Wilder, Schultheis, and City employee Dave Shane.

¶ 12      In January 2024, plaintiff filed a response to defendants' motion for summary judgment. He argued he had met his burden of stating a claim for common-law retaliatory discharge and showing a violation of the Whistleblower Act, in that evidence showed he was discharged in retaliation for (1) reporting illegal or improper conduct (common-law retaliatory discharge) or (2) disclosing information that he "had a reasonable basis to believe disclosed a violation of a state or federal law, rule or regulation" (the Whistleblower Act). He further maintained that although defendants had come forward with a proffered nonretaliatory reason for termination, it was for the trier of fact to determine whether the proffered reason was "believable or rather pretext for unlawful retaliation."

¶ 13      Plaintiff argued that a genuine issue of material fact existed with respect to defendants' motivation for his termination. He asserted evidence showed that (1) he did not

"negligently" fail to address the Grant Street water main break, (2) other City employees were not disciplined or terminated despite committing negligent or illegal acts in the performance of their job duties, and (3) his termination was not recommended by Schultheis, the commissioner who supervised him and was in charge of his department. Plaintiff also argued the evidence showed that he raised complaints "regarding matters occurring in the [C]ity" with Schultheis and that Schultheis "believed that he did bring some of [plaintiff's complaints] to [Wilder] and he may have even read out loud some of the complaints at some of the council meetings." To support his claims, plaintiff relied on the administrative record and the deposition testimony of Wilder, Schultheis, and Shane. He also attached Mann's deposition to his response.

¶ 14 Relevant to this appeal, the evidence presented by the parties showed that per the City's employee manual, all City employees were considered at-will employees. The City's employee discipline and termination policy set forth the following disclaimer:

> "Nothing in this Policy alters the at-will status of an employee or changes or enhances the Illinois Municipal Code [(65 ILCS 5/1-1-1 *et seq.* (West 2018))] and its application to employees in any way. In addition, this Policy does not create contract rights for the employee. This policy is meant for policy guidance for the Council in dealing with personnel issues."

The discipline and termination policy generally provided that the commissioner in charge of a particular department had the authority to discipline or initiate the dismissal of City employees within his or her department. Specifically, the commissioner could issue oral warnings, issue written reprimands, or impose emergency suspensions with pay. With the approval of the city council, a commissioner could also suspend an employee without pay. The discipline and termination policy further stated as follows:

"Suspensions and dismissals will be initiated and recommended by the Commissioner in charge of the City employee and approved by the City Council.

\* \* \*

Nothing in this Policy shall preclude the Council or Commissioner, as the case may be, from determining that immediate suspension or dismissal is warranted in any particular case, without prior reprimand or warning."

¶ 15    The evidence further showed that the City's stated reason for plaintiff's termination was his "failure to timely address and assess citizen complaints regarding [the Grant Street] water main leak." Wilder testified he became aware of the leak on December 31, 2017. A homeowner who lived at the location of the leak informed Wilder that he had reported the leak to plaintiff in June or July 2017, but "nothing was done about it." After the leak resurfaced in December 2017, plaintiff was informed "that he was going to be written up \* \* \* for negligence." Wilder explained the rationale for plaintiff's write up as follows:

"I was informed that the water leak had been reported to [plaintiff] in the summer of that year, which he ignored to investigate. Then on the coldest day of the year, the water leak was worse and needed to have outside sources brought in to repair."

¶ 16    Wilder testified that when he spoke with plaintiff about the leak in December 2017, plaintiff asserted the leak was not previously addressed because "he had checked into it, did not feel that it needed to be repaired at that time, and he was going to monitor the situation." Wilder testified that City employees Bob Short and Dave Shane informed him that plaintiff "had ignored to investigate the leak in the summer." He also stated that Schultheis opposed terminating plaintiff based on the water leak and that he "just did not believe that terminating [plaintiff] was a good idea." Schultheis also informed Wilder that he and plaintiff had investigated the Grant Street leak

in summer 2017.

¶ 17        Wilder maintained that while plaintiff was employed by the City, various "employment issues" arose, including issues that resulted in plaintiff being reprimanded or disciplined. He described the circumstances surrounding plaintiff's other "employment issues," and he stated the Grant Street water leak was "the straw that broke the camel's back with regards to [plaintiff's] employment with [the City]."

¶ 18        Regarding the Grant Street leak, plaintiff explained that in July 2017, a homeowner reported a water leak and "showed [him] a patch [of water] about the size of *** a five-gallon water bucket." Plaintiff testified that both he and Schultheis went to Grant Street to look at the leak. They also went back the following day and determined they were "not digging that." Plaintiff asserted he went by the location of the reported leak "100 times after that and never saw [a leak] again." Ultimately, however, the leak resurfaced in December. When Wilder learned that a homeowner had shown plaintiff the leak in July, plaintiff was terminated despite Schultheis explaining to Wilder that Schultheis told plaintiff " 'not to dig that.' " Plaintiff also asserted that "you never dig until [the leak] shows itself and stays shown" because that way you know the location of the leak.

¶ 19        Schultheis remembered going by the location of the reported Grant Street leak in summer 2017. He saw that the area was marked with a cone but did not notice anything "alarming." Schultheis testified that he would not have characterized plaintiff as neglecting the leak and agreed that in July 2017, there was no reason to dig up the area.

¶ 20        Schultheis testified that at the January 2018 city council meeting to discuss whether plaintiff should be terminated, he referenced individuals who were harassing plaintiff or making plaintiff's work environment hostile. He stated the individuals he was referring to were City

employees Shane and Short, stating they questioned everything plaintiff did. Schultheis recalled raising concerns over both employees at the January 2018 city council meeting. However, he testified he was reluctant to "push complaints *** forward" about Shane and Short because it might adversely affect plaintiff. Schultheis also recalled voting against plaintiff's termination, stating that from his observations, plaintiff performed his duties correctly. Schultheis testified he had to defend plaintiff quite a bit and thought that "it was just game on against" plaintiff after an occasion when plaintiff failed a drug test.

¶ 21 Shane testified he worked for the City's Streets and Alleys Department. His job duties included working in the City's water department on "rotated weekends." Shane recalled that the Grant Street leak had been reported in summer 2017, but it had not been repaired. He stated that it had been a dry summer and "next to where the leak was, the grass was real green." Shane described the leak and asserted there "was always water setting [*sic*] there." He maintained that he had reported the leak "several times" to both plaintiff and Wilder.

¶ 22 Regarding plaintiff's claims of alleged unethical or illegal conduct by Wilder, plaintiff testified he directed all his complaints or reports to Schultheis, asserting: "I was told my chain of command was *** Schultheis. That's the reason why I took the military approach, chain of command, you do not go over the chain of command." Plaintiff stated he "never brought anything to [Wilder's] attention," nor did Wilder or any of the other commissioners ever speak with him about what he had reported to Schultheis. Plaintiff maintained, however, that Schultheis always told him that he discussed the issues plaintiff raised with Wilder and would tell plaintiff, " 'You know he's going to double down on you.' " Plaintiff also testified that on multiple occasions close in time to his termination, Schultheis told him "[t]hat the mayor was going to get rid of [him]."

¶ 23    Plaintiff recalled having one meeting with Attorney Mann and Schultheis that occurred in 2017, two or three months before his termination, " 'to let [Mann] know that the mayor ha[d] been constantly harassing [plaintiff].' " When asked what was discussed at the meeting, plaintiff responded as follows:

> "For sure—for sure the [City employees] not attending class and lying to the mayor and *** Schultheis, for sure the Chapman skidsteer, for sure Ed Straw's compressor, J.U.L.I.E., we talked about most of these and how he treated me. He was always disrespecting me."

¶ 24    Schultheis testified that "if" plaintiff raised complaints about Wilder to him, he was "sure [he] would have taken them to Wilder himself." However, Schultheis stated he did not "remember any specifics" of having done so. He also testified that plaintiff "wrote up complaints" about how he was treated by Wilder that he gave to Schultheis. Schultheis testified he kept the written complaints in a file at his house but did not share them with Wilder or the other commissioners. Schultheis stated he no longer had the file due to flooding that occurred at his residence. He clarified that "a lot of" what was in the file was "updates on things, like what [plaintiff] had done *** throughout the week" and "what he had done to improve the system and save money." However, he testified there were "probably complaints in [the file] too" and that "everything that [plaintiff] wrote [he] kept." Schultheis testified that he may have taken some of the "reports" plaintiff gave him "up to the executive sessions and read them out." If that occurred, however, a transcript would have been made.

¶ 25    Wilder denied that Schultheis ever told him he was creating a hostile work environment for plaintiff or that his conduct toward plaintiff was harassing. Also, prior to plaintiff's termination, Mann never reported to him that plaintiff had raised allegations that he was

spending municipal money inappropriately. Wilder further denied that Schultheis ever told him about complaints raised by plaintiff, nor had plaintiff ever questioned him about the spending of municipal funds. Wilder testified that at no point in time while plaintiff was employed by the City did anyone tell him that plaintiff was accusing him of illegal or unethical conduct. The first he heard about plaintiff's claims was when he was served in the underlying lawsuit.

¶ 26 Mann's affidavit and deposition testimony showed that he recalled having two meetings with plaintiff in January 2018. The first meeting occurred "after the water leak incident" but prior to the city council's termination hearing, with Schultheis also in attendance. Schultheis indicated he had "some concerns that [Shane and Short] were targeting [plaintiff]." Regarding the meeting, Mann recalled as follows:

> "What I remember more was that [Schultheis] wanted me to understand that there may have been some things that [Shane and Short] were doing that were being overlooked and that [plaintiff] instead was being the focus of whatever, you know, referring to the leak incident and that kind of thing."

In particular, Schultheis thought that things Shane and Short were doing "on City time" were being overlooked and he shared "concerns that he had regarding the frequency of [plaintiff's] disciplinary matters that were coming up before the Council" and "what would happen if he lost [plaintiff as an] employee." Mann did not recall either Schultheis or plaintiff bringing up "illegal activities" during the meeting, nor did he remember Schultheis reporting "a list of unethical or illegal activities on behalf of any officers, elected officials of the City."

¶ 27 Mann's second meeting with plaintiff occurred after plaintiff's termination but before his appeal hearing. Mann stated, "That conversation was more about [plaintiff] wanting to know what his rights were on appeal." During that meeting, plaintiff also "started to kind of relay

some of the things about his work and the things that he had accomplished at the City." Mann advised plaintiff "that the appeal hearing would be a perfect time for him to bring those issues up."

¶ 28 Mann further testified he did not remember Schultheis ever reporting that Wilder was harassing plaintiff, either to him directly or at a meeting with city council members. If illegal activities of the mayor or city council had been reported to him, Mann would have written down and recorded what was reported "as a memo of concern." Finally, Mann asserted that he first learned of plaintiff's claims of alleged unethical or illegal acts by Wilder when plaintiff's complaint was served on his office.

¶ 29 The deposition testimony presented by the parties also contained further information on plaintiff's specific claims against Wilder. Regarding plaintiff's assertion that Wilder directed City personnel to purchase cold patch asphalt for use in the Chenoa Family Restaurant parking lot, plaintiff testified Wilder directed City employees Shane and Short to take such action and to perform work on the restaurant's parking lot. Plaintiff estimated it was in spring 2017 when he saw the work being performed at the restaurant. When the matter came to light, Wilder stated that he would have the restaurant pay for the asphalt. Plaintiff believed the asphalt was purchased with municipal funds but admitted that his belief was based on "speculati[on]." He recalled that Schultheis also told him the cold patch asphalt was purchased by the City. Additionally, he stated he was aware that Wilder went on vacation to Las Vegas and that he learned from "hearsay" that Wilder was "given that trip" by the owners of the Chenoa Family Restaurant.

¶ 30 Plaintiff stated he verbally reported the "cold patch" work to Schultheis but did not recall whether they discussed the issue of Wilder's trip to Las Vegas. Although it was his belief that Schultheis informed Wilder about what he reported, plaintiff acknowledged that he did not ask Schultheis to talk to Wilder; Schultheis never told plaintiff that he spoke with Wilder about

what plaintiff reported; and plaintiff did not know what discussions, if any, Schultheis had with Wilder or anyone else.

¶ 31 Schultheis testified he recalled plaintiff raising a complaint about some "missing" cold patch asphalt. However, Schultheis did not recall raising the issue with anyone else because he could not determine "the original amount" of cold patch asphalt that the City had. He also testified that on one occasion, plaintiff drove him by the Chenoa Family Restaurant, where Shane and Short were "patching a place" on "the apron" of the public roadway near the restaurant parking lot. The restaurant was located on a state route, which the City did not have any responsibility to maintain. When asked whether he discussed the incident with anyone, Schultheis testified as follows: "I don't know if I mentioned it to Wilder or not, I really don't."

¶ 32 Wilder denied that the City provided cold patch asphalt for use at the Chenoa Family Restaurant. However, he stated that in 2016 or 2017, he personally purchased cold patch asphalt for the restaurant, testifying as follows:

> "As a friend of the owner of the restaurant, he asked me if I knew where he could get the cold patch. I told him I did; that McLean County [A]sphalt is where we get ours. He asked if I would go get it for him, using his personal vehicle, which I did. And not knowing the exact price, I told him I would put it on my credit card and he could reimburse me."

Wilder maintained he provided his counsel with his personal credit card record that showed he "spent about $59 and some cents at McLean County Asphalt." He testified the cold patch asphalt was installed by restaurant employees. Further, he denied receiving a Las Vegas vacation from the restaurant, stating, instead, that the owner of the restaurant paid for his airfare to go see his parents. He denied that the airfare was received in exchange for anything.

¶ 33    During his testimony, Shane denied "doing some cold patch at the Chenoa restaurant." However, he stated Short told him that he "did some on the entrance of the [restaurant's] parking lot."

¶ 34    Plaintiff's next claim of alleged unethical or illegal conduct concerned Wilder giving away water meters to political supporters. As to that claim, plaintiff stated he was aware that in approximately spring 2017, Wilder gave a large, $700 water meter to an entity called 4D Construction. The water meter was for use in a vacant property that 4D Construction had recently purchased. Plaintiff testified the property at issue was an old manufacturing plant that 4D Construction was going to rehabilitate. He asserted that both he and Schultheis knew about the water meter issue and that they discussed it on at least one occasion. Schultheis told plaintiff that he also discussed the issue with Wilder and that Wilder stated, " 'We're giving it to them.' " Plaintiff acknowledged that Wilder's reasoning was "[q]uite possibly" based on the idea "of economic redevelopment and rehab," and he stated he had "[q]uite possibly" heard that reasoning before. Plaintiff also denied ever stating that 4D Construction was Wilder's political supporter, indicating he had no knowledge that Wilder had any connection to, or affiliation with, 4D Construction.

¶ 35    Wilder acknowledged that a water meter was installed in a building being renovated by 4D Construction. He noted it was City policy "to replace damaged water meters in both homes and buildings that have been abandoned for new owners. If they find that they are damaged when they buy them, we will replace them for them." Also, the water meter was provided to 4D Construction to further a redevelopment agreement it had with the City. Wilder testified that although there were instances when a property owner could be charged for the cost of a water meter, per a City ordinance, the City was the party responsible for buying and paying for water

meters.

¶ 36 Regarding his claim that Wilder directed City employees to cut down trees for a political supporter, plaintiff testified that Schultheis was the one who brought the incident to his attention. According to plaintiff, the City paid an outside contractor to cut down trees near a building owned by an individual named Don Corrie. Plaintiff acknowledged, however, that Corrie was not Wilder's political supporter, agreeing that Corrie ran for mayor against Wilder and lost. Plaintiff further testified that he (1) was not aware what Schultheis and Wilder discussed regarding the incident, (2) did not see the work being performed, and (3) did not "have an understanding of what the problem was with the trees."

¶ 37 Schultheis testified the incident involved the trimming of a tree that was on a City easement, which was common practice. Wilder testified that he was aware of two trees being removed from Corrie's property but that they were not taken down by City employees. Rather, City employees cleaned up "the refuse" that was in the street, "as they do for every constituent." Specifically, he asserted that "[i]f someone takes a tree out, we come by, pick up the pile, we take it out to what we call our city dump. We pile it up and then we burn it off." Wilder also testified that Corrie was not his political supporter and that he ran against Corrie for mayor in 2015.

¶ 38 Plaintiff's final claim of alleged illegal or unethical conduct concerned Wilder directing City employees to repair the roof of a political supporter's woodworking shop. At his deposition, plaintiff clarified that the incident involved only a property owner's use of the City's "man lift." He acknowledged that he did not know the identity of the property owner or whether that person politically supported Wilder. Plaintiff further stated that he did not know the financial arrangement, if any, that existed between the property owner and the City for the use of the man lift, nor did he know what work was being performed on the roof. He testified the woodworking

shop at issue was in the City's downtown area across the street from city hall. Regarding the roof incident, plaintiff did not know what discussions were had between Schultheis and Wilder, nor did he know if Schultheis discussed the incident with anyone else.

¶ 39    Wilder acknowledged that the City's lift was utilized at a location where roof work was being done but denied that there was a City employee working on the roof. He explained as follows: "The contractor that was working on the roof asked if he could use our lift to get equipment to the roof and materials." Wilder testified that furnishing the lift "was a way to allow a property owner nearby city hall to improve their building."

¶ 40    On January 24, 2024, the trial court conducted a hearing on the City and Wilder's motion for summary judgment. In March 2024, it entered a written order, granting the motion as to all remaining counts of plaintiff's second amended complaint. With respect to counts I and II—alleging a violation of the Whistleblower Act and a claim of common-law retaliatory discharge against the City—the court noted plaintiff alleged he was discharged in retaliation for reporting certain actions by Wilder. The court found, however, that in his deposition, plaintiff offered no factual support for his allegations of Wilder's wrongdoing. It also noted that plaintiff raised his complaints with Schultheis, his supervisor, but not with any governmental or law enforcement agency. Plaintiff further had no direct discussions with Wilder about his alleged illegal or unethical actions. The court determined that plaintiff presented no evidence to refute that he was terminated for any reason other than the reason provided by the City or that he was terminated in an act of retaliation. In granting summary judgment as to counts III and IV, raising the same causes of action against Wilder, the court cited case law for the proposition that the former employer "is the only proper defendant in a retaliatory discharge action."

¶ 41    This appeal followed.

¶ 42                                II. ANALYSIS

¶ 43        On appeal, plaintiff argues the trial court erred in granting summary judgment in the City's favor as to counts I and II of his second amended complaint. He contends that in reaching its decision, the court improperly weighed the credibility of witnesses and determined disputed issues of material fact. (Notably, plaintiff does not challenge the court's grant of summary judgment in Wilder's favor on counts III and IV.) For the reasons that follow, we find no error by the court.

¶ 44                             A. Summary Judgment

¶ 45        "The purpose of summary judgment is not to try a question of fact but, rather, to determine whether a genuine issue of material fact exists." *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 14, 178 N.E.3d 1046. Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). When ruling on a motion for summary judgment, "a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Lewis*, 2020 IL 124107, ¶ 15. "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." *Id.* Ultimately, "[s]ummary judgment is a drastic means of disposing of litigation and, therefore, should be granted only where the right of the moving party is clear and free from doubt." *Id.*

¶ 46        To survive a defendant's motion for summary judgment, the plaintiff is not required to prove his or her cause but "must present a factual basis that would arguably entitle [the plaintiff]

to a judgment." *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12, 21 N.E.3d 684. "If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is appropriate." *Lewis*, 2020 IL 124107, ¶ 15. On appeal, the trial court's summary judgment rulings are reviewed *de novo*. *Id.* Additionally, we may affirm the court's ruling on any basis supported by the record, regardless of its reasoning. *Illinois Municipal League Risk Management Ass'n v. City of Collinsville*, 2018 IL App (4th) 170015, ¶ 29, 100 N.E.3d 185.

¶ 47                              B. Count I—The Whistleblower Act

¶ 48          Section 15(b) of the Whistleblower Act states, "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b) (West 2018).

> "Thus, to establish a cause of action under section 15(b), the employee must show (1) an adverse employment action by his or her employer, (2) which was in retaliation (3) for the employee's disclosure to a government or law enforcement agency (4) of a suspected violation of an Illinois or federal law, rule, or regulation." *Sweeney v. City of Decatur*, 2017 IL App (4th) 160492, ¶ 15, 79 N.E.3d 184.

¶ 49          Here, the parties initially dispute whether plaintiff presented evidence establishing a disclosure to a government or law enforcement agency as contemplated by the Whistleblower Act. However, even assuming that such a disclosure was made, plaintiff's claim ultimately fails because of a lack of evidence showing that the individuals responsible for taking adverse employment action against him knew of his alleged disclosures and retaliated because of them.

¶ 50          "The requirement that the discharge be in retaliation for an employee's activities requires that a plaintiff establish a causal relationship between the employee's activities and the

- 18 -

discharge." *Brummel v. Grossman*, 2018 IL App (1st) 170516, ¶ 49, 121 N.E.3d 970. "The employer's motive in discharging the employee is the ultimate issue when deciding the element of causation." *Id.* " 'The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee.' " *Id.* (quoting *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 160, 601 N.E.2d 720, 728 (1992)).

¶ 51    Additionally, a recent federal district court decision provides that to establish a causal link between disclosures and an adverse employment action, a plaintiff must show that decisionmakers were aware of the plaintiff's disclosures. See *Schultz v. Ruan Transport Corp.*, ____ F. Supp. 3d ____, ____, 2024 WL 2763739, at *4 (N.D. Ill. May 30, 2024) (quoting *Hamer v. Neighborhood Housing Services of Chicago*, 897 F.3d 835, 841 (2018) (" 'To retaliate against a complainant, decisionmakers must be aware of the complaint.' ")). "Although this court is not bound by federal district court decisions, such decisions can provide guidance and act as persuasive authority." (Internal quotation marks omitted.) *Hadley v. Montes*, 379 Ill. App. 3d 405, 412, 883 N.E.2d 703, 710 (2008).

¶ 52    In *Schultz*, 2024 WL 2763739, at *3, the district court noted that although the plaintiff employee complained about workplace safety issues "to his colleagues and superiors," no evidence showed he told anyone connected with his employment that he also raised such issues with two government agencies. The plaintiff admitted that he did not know if anyone from the defendant employer knew about his complaints to those agencies, and every employee of the defendant who was asked denied having such knowledge. *Id.* Additionally, in response to the plaintiff's claim "that the defendant's stated reason for his termination—job abandonment—was pretextual," the court stated as follows:

"[The employee plaintiff] ultimately bears the burden of showing a nexus between

his termination and the conduct the Whistleblower Act protects. In other words, even if a jury could conclude that [the plaintiff's] termination was motivated by something other than his putative job abandonment, he can prevail on his claims only if he can show that the real reason was one that the [Whistleblower Act] prohibits. [Citation.] The evidence here simply does not raise such an inference." *Id.* at \*4.

¶ 53　In this case, evidence showed plaintiff's employment with the City was terminated following a vote by its city council. At the time of plaintiff's termination, the city council members were Wilder and the four elected commissioners—Buchanan, Price, Strike, and Schultheis. Although the stated reason for plaintiff's termination was his alleged failure to timely address a water main break, plaintiff alleged he was terminated in retaliation for disclosing certain unethical or illegal acts by Wilder to Schultheis, plaintiff's supervising commissioner. Significantly, however, Schultheis voted against plaintiff's termination, and no evidence establishes that plaintiff's alleged disclosures were communicated to any other city council member.

¶ 54　During his deposition, plaintiff testified he directed all his complaints or reports about Wilder to Schultheis and that he never brought any of his complaints or reports directly to Wilder's attention. His testimony further established that he had no firsthand knowledge of what specific communications Schultheis had with anyone else regarding what he disclosed.

¶ 55　Although Schultheis generally testified that "if" plaintiff had raised complaints about Wilder to him, he would have taken them "to Wilder himself," he could not remember anything specific about having done so. Schultheis also testified that plaintiff provided him with written reports about what plaintiff "had done to improve the [City's water] system and save money," as well as complaints about Wilder. However, Schultheis explicitly denied sharing the

written reports with Wilder or the other commissioners. While he stated he *may* have taken some of the "reports" plaintiff gave him "up to the executive sessions and read them out," Schultheis's testimony falls far short of showing that the reports he *may* have shared at executive sessions included either (1) general complaints that plaintiff had about Wilder or (2) plaintiff's specific accusations of illegal or unethical acts by Wilder that formed the basis for his whistleblower and retaliatory discharge claims.

¶ 56　　　　On appeal, plaintiff emphasizes the merits of his claims that concern the use of cold patch asphalt at the Chenoa Family Restaurant. Schultheis testified he recalled plaintiff raising a complaint about certain "missing" cold patch asphalt. However, when asked whether he had any discussions with anybody about that issue, Schultheis testified, "Not that I recall," noting he had been unable to determine whether any cold patch asphalt was missing from the City. Schultheis also testified that plaintiff drove him by the Chenoa Family Restaurant, where they observed Shane and Short "patching a place" on "the apron" of the road near the restaurant's parking lot. Again, when specifically asked whether he discussed that incident with anyone, Schultheis testified as follows: "I don't know if I mentioned it to Wilder or not, I really don't." The record otherwise shows that Wilder explicitly denied any knowledge of reports by plaintiff that he inappropriately used municipal funds. He testified that at no time during plaintiff's employment with the City did anyone tell him that plaintiff was accusing him of illegal or unethical conduct. Instead, Wilder asserted he first learned about plaintiff's allegations when he was served in the underlying lawsuit.

¶ 57　　　　Plaintiff also suggests that Mann was apprised of his claims of unethical or illegal conduct by Wilder. However, even if true, Mann was not responsible for the decision to terminate plaintiff's employment, nor does the evidence support a finding that he communicated any of plaintiff's purported disclosures to anyone with such decision-making authority. Rather, Mann

denied any knowledge of plaintiff's disclosures prior to the filing of the underlying action.

¶ 58        On review, the City argues, "[r]etaliation simply cannot exist in the absence of knowledge," and we agree. The city council members voting to terminate plaintiff could not have been motivated by his alleged disclosures if they were unaware of the disclosures in the first place. By failing to present evidence of a causal link between his "disclosure" activities and his discharge from employment, plaintiff has failed to establish a necessary element of his cause of action under the Whistleblower Act. Accordingly, the trial court committed no error in granting summary judgment in the City's favor as to count I.

¶ 59        C. Count II—Common-Law Retaliatory Discharge

¶ 60        The tort of retaliatory discharge " 'is an exception to the general rule that an "at-will" employment is terminable at any time for any or no cause.' " *Rehfield v. Diocese of Joliet*, 2021 IL 125656, ¶ 26, 182 N.E.3d 123 (quoting *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 128, 421 N.E.2d 876, 878 (1981)). To establish such a claim, "a plaintiff must show (1) that she has been discharged; (2) in retaliation for her activities; and (3) that the discharge violates a clear mandate of public policy." (Internal quotation marks omitted.) *Id.* ¶ 27. "The requirement that the discharge be in retaliation for plaintiff's activities requires that a plaintiff establish a causal relationship between the employee's activities and the discharge." *Michael v. Precision Alliance Group*, LLC, 2014 IL 117376, ¶ 31, 21 N.E.3d 1183.

¶ 61        For the same reasons expressed above, we find plaintiff has failed to present evidence of a causal relationship between his activities—his reports of, or complaints about, Wilder's alleged unethical or illegal activities—and his discharge from employment. Again, by failing to present facts establishing causation, he has failed to establish a necessary element of his common-law retaliatory discharge claim. Under the circumstances presented, the trial court

properly granted summary judgment in the City's favor as to count II of plaintiff's second amended complaint.

¶ 62                          III. CONCLUSION

¶ 63          For the reasons stated, we affirm the trial court's judgment.

¶ 64          Affirmed.